José de Jesús Rivera, SBN 004604
MILLER, PITT, FELDMAN
 & McANALLY, P.C.
2800 North Central Avenue,
Suite 840
Phoenix, AZ 85004-1069
(602)266-5557; Fax (602)266-2223
jrivera@mpfmlaw.com

*Attorney for Plaintiff*
*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
## TUCSON DIVISION

|  |  |
|---|---|
| Tucson Unified School District, | Case No.: |
| Plaintiff, | |
| - vs - | **PLAINTIFF'S ORIGINAL COMPLAINT** |
| Juul Labs, Inc., | |
| Defendant. | **JURY TRIAL DEMANDED** |

# Table of Contents

I.    NATURE OF THE CASE ................................................................. 4

II.   PARTIES ....................................................................................... 7

III.  JURISDICTION AND VENUE ....................................................... 8

IV.   FACTUAL ALLEGATIONS ........................................................... 8

   A.  JUUL is Created to Bring Tobacco Use to a New Level of Accessibility ..................... 8

   B.  Regulatory Landscape for E-Cigarettes .................................................. 10

   C.  E-Cigarette Use Presents Severe Physical and Mental Health Risks, Particularly to Youth .................................................................................. 11

   D.  JUUL's E-Cigarette and Nicotine Juice "JUULpods" ................................... 16

      1.  JUUL Designed Its E-Cigarette and Nicotine Juice to Target Youth ........................ 18

      2.  JUUL Misrepresented and Concealed the True Design of its E-Cigarettes and JUULpods, Including Their Highly-Addictive Nature and the Amount of Nicotine Delivered ............................................................................. 24

   E.  JUUL's Marketing Campaign ............................................................ 32

      1.  JUUL Learns from Big Tobacco and Employs Youth-Oriented Marketing Tactics Prohibited for Manufacturers of Combustible Cigarettes .................................. 32

      2.  JUUL Uses Social Media to Inundate Youth ............................................. 38

      3.  JUUL's Point-of-Sale Advertising ....................................................... 44

      4.  JUUL's Youth-Oriented Flavoring ....................................................... 45

      5.  JUUL Attempts to Rewrite History ....................................................... 50

      6.  JUUL's Marketing was Deceptive and Failed to Warn of the Risks Associated with Use of its E-cigarette and JUULpods ..................................................... 53

   F.  JUUL Targets Schools .................................................................... 54

   G.  JUUL's Illegal Conduct Gives Rise to a Youth E-cigarette Epidemic and Puts a Generation at Risk ....................................................................... 56

   H.  Schools Are Uniquely and Disproportionately Harmed by JUUL's Conduct .............. 58

I.   JUUL Has Experienced Extraordinary Financial Success at the Expense of America's Youth, Parents, and Educators ..................................................................................... 63

J.   Government Investigations and Regulatory Actions Seek to Hold JUUL Accountable and Combat the Teen JUUL Epidemic ........................................................................... 64

K.   The FDA Issues a Warning Letter Outlining JUUL's Deceptive Marketing and Targeting of Schools ..................................................................................................... 67

V.   CAUSES OF ACTION ..................................................................................................... 70

VI.   PRAYER FOR RELIEF ................................................................................................... 92

VII.   DEMAND FOR JURY TRIAL ........................................................................................ 92

*/ / /*

Plaintiff, Tucson Unified School District ("Plaintiff" or "Tucson Unified") respectfully submits this Complaint against defendant Juul Labs, Inc. ("JUUL" or "Defendant").   Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters based on the investigation of counsel.

## I.   NATURE OF THE CASE

1.   Nicotine use and addiction has horribly and irreparably impacted countless lives.  Years ago, cigarette manufacturers marketed their products as trend-setting and relatively harmless, and they developed a strategy of marketing traditional cigarettes to youth.  Cigarette advertising depicted smokers as cool and attractive, the type of people America's youth aspired to be.  Cigarette manufacturers knew that teenagers were particularly susceptible to becoming addicted to nicotine, and that addicting a 14-year old to smoking gained a customer for decades, potentially.  From concealed studies later made public through litigation, and after countless deaths, Americans learned that smoking traditional cigarettes was highly addictive and posed serious health hazards.

2.   Over time, a stigma grew around smoking traditional cigarettes.  Laws prohibiting indoor smoking proliferated, protecting the non-smoking public from the dangers and unpleasantness of second-hand smoke, and forcing smokers to take their breaks outside.  Finally, cigarette smoking was on a serious decline.  However, the addictive nature of nicotine continued to present an economic opportunity to those willing to exploit the economics of addiction.

3.     Though not alone in pursuing development of electronic cigarettes, JUUL did so with a proven and familiar strategy.  Taking a page from big tobacco's playbook, JUUL, in concert with its advertising agencies and others, developed a product and marketing strategy that sought to portray its e-cigarette products as trend-setting, stylish and used by the type of people teenagers aspire to be.  JUUL used advertisements eerily similar in scheme and content to those used decades ago by traditional cigarette manufacturers before they were banned for targeting youth.  JUUL also used more modern methods of marketing through social media where teenagers, especially, hang out.  In particular, JUUL enlisted the services of social media "influencers"—social media personalities with large followings ("Social Media Influencers")—to promote JUUL's products.  Similarly, JUUL developed an "affiliate program," paying third parties ("JUUL Affiliates") to refer potential customers to JUUL's website while forbidding the JUUL Affiliates from disclosing their affiliation with JUUL, cultivating a convincing but misleading appearance of organic growth of "cool."

4.     JUUL spent liberally when marketing directly to students.  Through "education" programs at schools, JUUL employees and agents sought to raise awareness among students of JUUL's flavored, low-irritation, nicotine products.  JUUL used both its own employees and hired consultants to speak to students.  At one point, it appears JUUL sponsored a summer camp for kids, ranging in age from third graders to seniors in high school, in order to collect data on the camp's participants.

5.     JUUL designed its products to appeal aesthetically to youth and used marketing tactics long ago banned for manufacturers of combustible cigarettes.  But that wasn't enough.  JUUL also, since launching its product in 2015, has misrepresented material

facts regarding its products and their effects on users. Specifically, JUUL has misrepresented the amount of nicotine a JUUL device delivers to a user's bloodstream and the increased risk of nicotine addiction and other severe health consequences the higher-than-disclosed nicotine levels present. JUUL created a misleading impression that its products were a "healthy" alternative to smoking.

6. As a result of JUUL's youth-targeted marketing and misrepresentations about its products, JUUL has succeeded in addicting a new generation of youth to nicotine. Nicotine use among America's youth is rising sharply. With JUUL as the dominant market-leader, e-cigarette use increased 78% among high-school students and 48% among middle-school students from 2017 to 2018. The U.S. Food and Drug Administration ("FDA") Commissioner called these results "astonishing." The Secretary of the U.S. Department of Health and Human Services, Alex Azar, recently stated at a press conference: "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."

7. While parents, teachers, health care practitioners, and federal and local governments have been combatting the spreading wildfire of teen vaping that JUUL has ignited, school districts have been uniquely and disproportionately impacted. Educators are being forced to spend significant resources to combat, police, and try to prevent the illegal and unhealthy use of JUUL products by underaged students. JUUL use at school creates enormous distractions for students and detracts from educators' limited time and resources to educate their student population generally. Schools have installed sensors in bathrooms, removed bathroom doors, and banned USB flash drives, to name just a few of the steps

taken.  More action is needed, as those measures do not even address the underlying epidemic of nicotine addiction.

8.     JUUL's conduct has created a public nuisance of underage vaping across America, including within Plaintiff's School District, and is forcing Plaintiff to spend significant time, money, and human resources to combat this nuisance to try to preserve its core mission of educating students.

9.     This action seeks to hold JUUL accountable for its tortious and illegal conduct, acting in concert with others, including creating and maintaining a public nuisance causing harm to Plaintiff.

## II.    PARTIES

10.    Plaintiff Tucson Unified has been serving the Tucson community since 1867. Tucson Unified includes 89 schools serving over 44,000 students.  Tucson Unified's mission includes ensuring its students receive an engaging, rigorous and comprehensive education. Plaintiff's administrative offices are located on East Tenth Street in Tucson, Pima County, Arizona.

11.    Defendant JUUL is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed Juul Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes and JUULpods.

III.   **JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff and Defendant are each citizens of different states.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. 1331 and 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Plaintiff because Plaintiff resides in Pima County and is a citizen of the State of Arizona.

15.     This court has personal jurisdiction over Defendant because it does business in the District of Arizona and has sufficient minimum contacts with this District. Defendant intentionally avails itself of the markets through the promotion, marketing, and sale of the products at issue in this lawsuit to render the exercise of jurisdiction by this Court permissible under Arizona law and the United States Constitution. Furthermore, a substantial part of the events giving rise to the claims occurred in this judicial district.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

IV.   **FACTUAL ALLEGATIONS**

   A.   **JUUL is Created to Bring Tobacco Use to a New Level of Accessibility**

17.     In 2004, Adam Bowen and James Monsees were graduate students pursuing master's degrees in product design at Stanford. Both were smokers at the time. One night, during a smoke break, an idea was born for the pair's thesis presentation. After interviewing

fellow smokers on what they liked and disliked about smoking traditional combustible cigarettes, Bowen and Monsees presented on, what they called, "the national future of smoking." That presentation would ultimately lead to the formation of JUUL and the pair's now multi-billion-dollar success in the e-cigarette and vaping industry. Bowen and Monsees are Chief Technology Officer and Chief Product Officer, respectively, at JUUL.

18.     In later discussing his motivations behind developing vaporizers and e-cigarettes, Monsees said he felt there was a "large opportunity for technology to … ***deliver solutions that refresh the magic and luxury of the tobacco category***." Monsees saw opportunity "for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products," *i.e.*, consumers who were not current smokers. The goal was to "recreate the ritual and elegance that smoking once exemplified [and] remove tobacco's social stigma and public adversity while ***bringing tobacco use to a new level of accessibility***." Monsees saw the development of "great new offerings in the tobacco space" as "new experiences that preserve the wonder and elegance of smoking." "As smokers, [Bowen and Monsees] knew a true alternative to cigarettes would have to ***offer a nicotine level found in no other alternative on the market***."

19.     Bowen and Monsees founded Ploom in 2007, then sold the Ploom name to Japan Tobacco Inc.—the world's third largest tobacco company—in 2015. The pair renamed their company Pax Labs Inc. In 2017, the company was renamed Juul Labs, Inc.

20.     From inception, JUUL has exploited regulatory inaction to design, manufacture, market, and sell highly-addictive nicotine products to youth through a youth-oriented marketing campaign and its parade of misstatements and omissions.

**B.     Regulatory Landscape for E-Cigarettes**

21.     In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act") as an amendment to the Federal Food, Drug, and Cosmetic Act.  That amendment put oversight of the manufacture, marketing, distribution, and sale of cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco products within the FDA's purview.  The Tobacco Control Act also gave the FDA the authority to "deem" other "tobacco products" within its authority.

22.     In May 2016, the FDA issued a final deeming rule, effective August 8, 2016, that deemed electronic nicotine delivery systems ("ENDS"), which includes e-cigarettes, subject to the FDA's regulatory authority.  Under the rule, years of regulatory and legislative requirements in place for combustible cigarettes became applicable to e-cigarettes.  Those regulations included, among other things, that new tobacco products could be marketed only after FDA review.

23.     However, as acting director of the FDA Dr. Norman Sharpless recently testified:

> FDA's initial compliance policy for premarket review stated that the Agency did not intend to enforce the requirements of premarket review against manufacturers of newly-regulated new tobacco products that were on the market as of August 8, 2016, as long as they submitted applications seeking marketing authorization within specific timeframes. As a result, FDA anticipated that many ENDS products would remain on the market without premarket authorization for up to three years."

24.     The FDA gave JUUL and other e-cigarette manufacturers until 2022 to submit a premarket tobacco application ("PMTA").  After public health and medical groups, including the American Academy of Pediatrics, filed suit, Judge Grimm in the United States

District Court for the District of Maryland ordered the FDA to move up the deadline to May 2020.

25.     JUUL has not submitted a PMTA for its e-cigarettes or JUULpods.  Because federal regulation requires FDA approval prior to the marketing of any e-cigarette, as Dr. Sharpless recently testified: "All ENDS products currently on the market are illegal.  They have not been reviewed by the FDA."

### C.     E-Cigarette Use Presents Severe Physical and Mental Health Risks, Particularly to Youth

26.     All leading health authorities support the three major conclusions of a 1988 report by the Surgeon General of the United States regarding nicotine and tobacco:

    a.   Cigarettes and other forms of tobacco are addictive;

    b.   Nicotine is the drug in tobacco that causes addiction; and

    c.   The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

27.     Nicotine fosters addiction through the brain's "reward" pathway.  A stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin and causes muscle relaxation.  When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs.  Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety.  These effects are caused by the release of dopamine, acetylcholine,

epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.[1]

28.     The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.[2]

29.     Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors, and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.[3]

---

[1] Benowitz, *Pharmacology of Nicotine: Addiction, Smoking-Induced Disease, and Therapeutics*, Annu. Rev. Pharmacol. Toxicol. 49: 57–71 (2009), *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC2946180/.
[2] *Id.*
[3] Rigotti, *Strategies to Help a Smoker Who Is Struggling to Quit*, JAMA 308 (15): 1573–1580 (2012), *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC4562427/;  Paolini & De Biasi, *Mechanistic insights into nicotine withdrawal*, Biochem. Pharmacol. 82(8): 996–1007 (2011), *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC3312005/.

30.     JUUL e-cigarettes and JUULpods deliver toxins and carcinogens that are dangerous to their users. Those dangers are particularly pronounced for teenage users. As former FDA Commissioner David Kessler aptly put it: "A long and tragic history has taught us that nicotine addiction often begins as a pediatric disease." One peer-reviewed study found that "[y]oung adults who use electronic cigarettes are more than four times as likely to begin smoking tobacco cigarettes within 18 months as their peers who do not vape."[4]

31.     Nicotine is a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems. Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys. Exposure to nicotine produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders.

32.     Research has also shown that e-cigarette users are at an increased risk of strokes and heart attacks,[5] including blood pressure and arterial stiffness, which increases the

---

[4] Primack *et al.*, *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, Am. J. Med. Vol. 131, Issue 4, 443.el-443.e9 (Apr. 2018), *available at* www.amjmed.com/article/S0002-9343(17)31185-3/fulltext.

[5] *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries, American Stroke Association News Release*, Abstract 9, Session A2, (Jan. 30, 2019), http://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries; Vindhyal *et al.*, *Impact on cardiovascular outcomes among e-cigarette users: a review from National Health Interview Surveys*, Journal of the American College of Cardiology, Vol. 73, Iss. 9, Suppl. 2, (March 2019), *available at* www.onlinejacc.org/content/73/9_Supplement_2/11; Ndunda & Muutu, International Stroke Conference, 2019 Oral Abstracts, Community/Risk Factors: Electronic cigarette use is associated with a higher risk of stroke, Vol. 50, Suppl. 1, Abst. 9 (2019), *available at* www.ahajournals.org/doi/10.1161/str.50.suppl_1.9; Bhatta & Glantz, *Electronic Cigarette Use and Myocardial Infarction Among Adults in the US Population Assessment of Tobacco and Health*, Journal of the American Heart Association, Vol. 8, No. 12 (2019), *available at* www.ahajournals.org/doi/10.1161/JAHA.119.012317.

13

risk for strokes and heart attacks.[6]  Other than its use as a stimulant, nicotine's only other known use is as an insecticide.[7]  Ironically, it has been banned as a pesticide in the U.S. since 2014.[8]

33.    Nicotine exposure during adolescence is associated with "deficits in working memory, attention, and auditory processing, as well as increased impulsivity and anxiety [and] increase[ed] addiction liability for other drugs."[9]  The same research paper noted:

> Peters et al. examined neural responses to anticipation of financial reward in adolescent smokers (age 14 years) and found that they had smaller neural responses in the ventral striatum and midbrain compared to matched non-smoking controls. Moreover, the reduced response showed a clear-cut relationship with the frequency of smoking. These findings suggest that adolescent smokers display a hypo-responsivity to the anticipation of non-drug reward (i.e., financial reward) relative to non-smokers, and this hypo-responsivity becomes more severe with increased smoking. There is also evidence that adolescents who smoke ≤5 cigarettes per day display attenuated responses to other non-drug rewards, including pleasurable food images, relative to non-smokers, in areas including the insula and inferior frontal region. ***The implication of both these studies is that the use of extremely rewarding drugs, such as nicotine, may decrease the perception of the pleasure obtained from non-drug rewards. Furthermore, the fact that this was demonstrated in young- and light-smoking teens indicates that such changes in the brain occur in early phases of smoking***.[10]  (emphasis added)

---

[6] Vlachopoulos *et al.*, *Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers*, J. Am. Col.1 Cardiol. 67:2802-2803 (Sep. 10, 2017), *available at* www.sciencedaily.com/releases/2017/09/170910232512.htm; Thompson, *Vaping May Hurt the Lining of Your Blood Vessels*, WebMD HealthDay Reporter (May 28, 2019), www.webmd.com/mental-health/addiction/news/20190528/vaping-may-hurt-the-lining-of-your-blood-vessels#1 (last visited Sep. 12, 2019).

[7] Mishra *et al.*, *Harmful Effects of Nicotine*, Indian J. Med. Paediatr. Oncol. 2016 Jan-Mar 36(1): 24-31 (2015).

[8] *Id*.

[9] England *et al.*, *Developmental toxicity of nicotine: A transdisciplinary synthesis and implications for emerging tobacco products*, Neurosci Biobehav Rev. 2017 Jan.; 72: 176-189, *available at* https://ncbi.nlm.nih.gov.pmc/articles/PMC5965681/pdf/nihms837061.pdf.

[10] *Id*. (internal citations omitted; emphasis added).

34.     Additional evidence suggests that nicotine can affect an adolescent's neurological development and that adolescents are more vulnerable to nicotine addiction.[11] "[N]icotine exposure during vulnerable periods of brain and lung development can have lasting detrimental effects...."[12] In particular, "[s]moking cigarettes during adolescence has been associated with lasting cognitive and behavioral impairments, including effects on working memory and attention and reduced prefrontal cortex activation...."[13] There is "compelling ... evidence that nicotine exposure during adolescence causes both long-term structural and functional changes in the brain."[14]

35.     JUUL's defective design also puts e-cigarette users, particularly adolescents or young adults with developing brains, at an increased risk of experiencing seizures, and a risk of users inadvertently swallowing the nicotine juice in the JUULpods. The FDA is currently investigating reports of youth and young adults who are experiencing seizures following the use of e-cigarettes.

36.     Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary

---

[11] Arain *et al.*, *Maturation Of The Adolescent Brain*, Neuropsychiatric Disease and Treatment, 9:449-461 (Apr. 25, 2013) *available at* https://doi.org.10.2147.NDT.S39776; England *et al.*, *Nicotine and the Developing Human: A Neglected Element in the Electronic Cigarette Debate*, Am J Prev Med. 2015 August; 49(2): 286-293, *available at* https://ncbi.nlm.nih.gov/pmc/articles/PMC4594223.
[12] England *et al.*, *Nicotine and the Developing Human: A Neglected Element in the Electronic Cigarette Debate*, Am J Prev Med. 2015 August; 49(2): 286-293, *available at* https://ncbi.nlm.nih.gov/pmc/articles/PMC4594223.
[13] *Id*.
[14] *Id*.

disease, just like traditional cigarette smoking.  Vaping also triggers immune responses associated with inflammatory lung diseases.

37.    Public health authorities have concluded that e-cigarettes are particularly unsafe for anyone under age 26.[15]

### D.    JUUL's E-Cigarette and Nicotine Juice "JUULpods"

38.    Although big tobacco companies had sought to replicate their success with traditional, combustible cigarettes in an electronic cigarette for years, the e-cigarette market began to take substance in 2010.  In 2010, NJoy, an Arizona based company, became the industry's first darling.  By 2013, e-cigarettes had grown to a $1.7-billion-a-year business. NJoy's mistake, however, was marketing an e-cigarette product that looked nearly identical to a traditional cigarette.  The stigma that came with being a smoker at the time stymied NJoy's sales and the company filed for bankruptcy in 2016.

39.    JUUL, operating as Ploom at the time, had also launched an e-cigarette product in 2010.  JUUL's product resembled a fountain pen.  JUUL's design failed to take off and drew only modest revenues: $30 million by 2015.  To attain the multi-billion-dollar success of traditional cigarettes, which Monsees has described as an "amazing product" and "the most successful consumer product of all time," JUUL knew it had to switch gears.  The gear JUUL chose was not new.  Rather, JUUL sought to replicate the financial success of traditional cigarettes by using the same playbook big tobacco used: design a product

---

[15] U.S Surgeon General and the U.S. Centers for Disease Control and Prevention, Office on Smoking and Health, *Know The Risks: E-cigarettes and Young People*, https://e-cigarettes.surgeongeneral.gov/ (last visited September 30, 2019).

attractive to youth, market it directly to youth, and misrepresent or conceal its adverse health effects, thereby gaining customers for life.

40.   To do that, JUUL went straight to the source: tobacco industry product and marketing documents made public under big tobacco's landmark settlements with government officials and injured smokers. According to Monsees, tobacco industry documents "became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

41.   Among those tobacco industry documents were documents concerning the process to manipulate nicotine pH to maximize the delivery of nicotine while minimizing "throat hit," *i.e.*, irritation, to appeal to youth and non-smokers. JUUL also hired former big tobacco research and design personnel to help develop JUUL's products.

42.   With the help of the big tobacco playbook on addicting young consumers to nicotine in hand, JUUL launched its current design in 2015. Knowing it needed a product design that would avoid the stigma associated with smoking traditional cigarettes and ultimately appeal to youth, JUUL's revamped product resembled a device commonly found at schools and in backpacks across the country: a USB flash drive. A user can even charge it in a computer USB drive. JUUL's e-cigarettes are small enough to fit in the user's hand—making it easier for students to conceal their use—and come in stylish designs and colors.

43.   Each JUUL product has two components: the e-cigarette and the pod. First, the e-cigarette holds the battery and temperature regulation system. The thin, rectangular e-

cigarette is made up of an aluminum shell, a battery, a magnet for the USB-charger, a circuit board, an LED light, and a pressure sensor.

44.     Second, there's the pod, marketed as "JUULpods."   JUUL claims that each pod contains 0.7 milliliters of JUUL's patented juice made up of nicotine, glycerol and propylene glycol, benzoic acid, and flavorants.   JUULpods come in sweet flavors including mango, fruit medley, "cool" mint, "cool" cucumber and crème brulee.   The pod is inserted into the end of the e-cigarette device.   When the device senses the movement of air, *i.e.*, the user sucking air through it, the liquid is then heated up, creating a vapor, which quickly dissolves into the air.   JUUL describes the e-cigarette as an "easy to use vaporizer."   Unlike the distinct odor produced by cigarette smoke, the odor emitted from a JUUL e-cigarette is a reduced aerosol with little or no odor.

   

### 1.     JUUL Designed Its E-Cigarette and Nicotine Juice to Target Youth

45.     JUUL e-cigarettes' physical design is sleek, stylish, and easily concealed.   In combination with JUUL's deceptive marketing, discussed below, the e-cigarette's design portrayed the device as a "must have" tech product, not a life-threatening, nicotine-delivery device.   The small USB-shaped design enables users to conceal the e-cigarette or, if not

concealed, the device is often mistaken for a USB flash drive. The JUUL's battery indicator light also gratuitously flashes in "party mode" when the user shakes the device. That feature is not necessary to the proper functioning of the device and intended solely to make the product appeal to youth.

46.     In addition to a design that would appeal to youth, JUUL developed a proprietary way of delivering nicotine, by mixing nicotine with a chemical called benzoic acid to produce nicotine salts. JUUL also increased the nicotine "kick" by purportedly using up to 5% nicotine, compared to previous products containing 1%-2% of nicotine that had not been treated with acids. The result is a quicker, stronger, and more palatable delivery of nicotine. The cigarette industry has long known that "nicotine is the addicting agent in cigarettes" and that "nicotine satisfaction is the dominant desire" of nicotine addicts.[16]

47.     Indeed, cigarette companies spent decades manipulating nicotine in order to foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," manipulating the Ph of nicotine was expected to give cigarettes an "additional nicotine 'kick.'"[17] This kick was

---

[16] Tobacco Industry Quotes on Nicotine Addiction,
https://www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine%20Addiction.pdf (last visited Sep. 12, 2019).
[17] *Id.*

attributed to increased nicotine absorption associated with lower pH.[18]

48.     JUUL leveraged the RJR research and conclusions to produce an increased nicotine kick, and thereby fueling increased use and sales of JUUL e-cigarettes.  JUUL's U.S. patent No. 9,215,895 (the "'895 patent") details how "certain nicotine salt formulations provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."[19]  The patent states: "the peak concentration of the nicotine in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."

49.     To illustrate its claims, JUUL submitted charts with its '895 patent to show that its nicotine salts with a 4% benzoic acid solution closely match the amount of nicotine delivered into the bloodstream by a Pall Mall cigarette.  As the chart indicates, a 4% solution of benzoic acid nicotine salt causes a higher (15 ng/mL) peak nicotine-blood concentration than a Pall Mall Cigarette (11 ng/mL).

///

---

[18] Benowitz *et al.*, *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology*, Handb Exp Pharmacol 192:29–60 (Oct. 13, 2010), *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.
[19] U,S. Patent No. 9,215,895 (filed Oct. 10, 2014), https://patents.google.com/patent/US9215895B2/en (last visited September 5, 2019).

FIG. 4



50.    JUUL's manipulation of the concentration of benzoic acid and use of nicotine salts allows JUUL to increase the potency of the nicotine in its JUULpods while reducing "throat-hit" or irritation.   Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form.  This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat.  A recent study found that JUUL's e-liquid had a pH of under 6.0, suggesting that JUUL's nicotine juice contains almost no freebase (*i.e.*, non-salt form) nicotine.[20]

---

[20] Lauterbach, *One More Time: Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There?* (2018), *available at*
www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf.   Other studies have confirmed the low ratio of freebase nicotine in JUUL products. *See* Duell *et al.*, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431-434, 431 (2018) ("Duell Study").

51.     JUUL's creation of a product with low levels of harshness and minimal "throat hit" is consistent with the goal of producing a product for young non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation. The design also shows that JUUL's intention was to recruit non-smokers, not current smokers, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix. Minimizing the "throat hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers but is crucial to luring a new generation of users.

52.     JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful. Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation. Reducing or removing this feedback impairs the user's ability to ascertain that he is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction, and repeatedly exposing the user to the health risks associated with the product, such as significantly increased blood pressure.

53.     The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL product emits. By altering the temperature, maximum puff duration, or airflow, among other things, JUUL precisely controls the amount of nicotine vapor delivered. JUUL's product design sought to reduce the amount of physical irritation a user experienced while maximizing the amount of

22

nicotine that enters the users' bloodstream.  One study found that the "reduced harshness …  may well contribute to the current use prevalence of JUUL products among youth" and that "harshness of the inhaled aerosol," or lack thereof for JUUL, is "relevant regarding abuse liability."[21]  The Duell Study's findings indicated that JUUL's harshness is comparable to a nearly nicotine-free 3 mg/mL e-liquid.[22]

54.     The result is a nicotine product that is easier to ingest and is more likely to harm than traditional cigarettes.  Former FDA Commissioner David Kessler referred to this as "'facilitating initiation,'" noting that JUUL's "fundamental design appears to ease young people into using these e-cigarettes and ultimately, addiction."

55.     A question and response during recent testimony before the House Committee on Energy & Commerce directly implicates JUUL's actions described herein as causing the youth-vaping epidemic:

Representative Kuster of New Hampshire: "Based on [Centers for Disease Control and Prevention ("CDC")] surveillance and research, what do you believe are the reasons that young people are smoking e-cigarettes at such alarming rates?"

Dr. Schuchat, Principal Deputy Director of the CDC: "We know that flavors are a principle attractant to young people.  Um, the latest generation of e-cigarettes, also, um, are extremely high in nicotine content, they, um, often include nicotine salts which are a little bit more palatable or um less bitter and the flavors are, you know, really targeted at youth.  So we think the addictiveness of the high nicotine level and the appeal of the flavors are key.  We also think some of the companies have had, um, youth-targeting ads."

---

[21] Duell Study at 431, 433.
[22] *Id*., Figure 3.

### 2. JUUL Misrepresented and Concealed the True Design of its E-Cigarettes and JUULpods, Including Their Highly-Addictive Nature and the Amount of Nicotine Delivered

56. From JUUL's 2015 product launch through today, JUUL has made repeated misstatements and omissions concerning the design and operation of its e-cigarettes and JUULpods, and their impact on users.

57. First, JUUL understates the concentration of nicotine its product delivers. Studies have shown that JUUL e-cigarettes contain higher levels of benzoic acid and nicotine than JUUL represents. Rather than the 4% benzoic acid solution disclosed in JUUL's patent paperwork, JUUL products have been found to have a benzoic acid solution upwards of 4.5%.[23] That same study found that a single JUULpod contains 6.2% nicotine or 60 mg/mL of nicotine per JUULpod. Other studies, such as the Reilly Study, have reported even higher actual concentrations of nicotine in JUULpods. By contrast, JUUL represents that each JUULpod contains "5% nicotine by weight at the time of manufacture."

58. Second, JUUL deviates from the '895 patent formulation and manufactures a product that causes dangerously high amounts of nicotine to be absorbed into the bloodstream. This results in a product that creates an unprecedented risk for nicotine addiction. Indeed, the "amount and speed of nicotine delivery ... plays a critical role in the potential for abuse of tobacco products."[24]

---

[23] Pankow, *et al.*, *Benzene formation in electronic cigarettes*, PLoS ONE 2017;12(3):e0173055 (March 8, 2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173055 (last visited September 12, 2019).

[24] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A report of the Surgeon General, Chapter 4, Nicotine Addiction: Past

24

59.     Third, contrary to JUUL's repeated representations that each JUULpod contains nicotine "approximately equivalent to 1 pack of cigarettes or 200 puffs," JUUL's products actually deliver doses of nicotine that are materially higher than combustible cigarettes. The United Kingdom Medicines and Healthcare Products Regulatory Agency notes: "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)." JUUL's nicotine concentration has been found to be 60 mg/ml, and JUUL's salt form increases the rate and efficiency of nicotine delivery. JUULpods therefore substantially exceed the nicotine dose of a traditional cigarette.

60.     As of May 2016, the European Union had banned e-cigarettes with a concentration exceeding 20 mg/ml nicotine. Israel banned the import and sale of JUUL's e-cigarettes in August 2018, calling JUUL's high nicotine concentration levels "a danger to public health."

61.     Comparison of available data regarding per puff nicotine intake further indicates that JUUL products delivers about 30% more nicotine per puff. A recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes."[25] The Reilly Study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that, based on a puff volume of 75/mL, a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per puff.

---

and Present (2010), *available at*
https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf.
[25] Reilly *et al.*, *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, Nicotine Tob. Res. 3 (Oct 20, 2018), *available at*
https://www.ncbi.nlm.nih.gov/pubmed/30346584 (the "Reilly Study").

62.     By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 µg/puff.[26]  Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75mL/puff, a Marlboro would deliver between 114 and 144 µg/puff.  In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

63.     Because "nicotine yield is strongly correlated with tobacco consumption,"[27] a JUULpod with more nicotine will strongly correlate with higher rates of consumption of JUULpods.  For example, a historic cigarette industry study looking at employees who smoked found: "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."  In other words, the more nicotine in the cigarettes, the more cigarettes a person smoked.

64.     By delivering such potent doses of nicotine, JUUL products magnify the health risks posed by nicotine, significantly increase blood pressure, and place users at a heightened (and concealed) risk for stroke, heart attacks and other cardiovascular events.

65.     Further, because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes.  Thus,

---

[26] Schroeder & Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, Tobacco Control 2014: 23:ii30-ii35 (May 2014), *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

[27] Jarvis *et al.*, *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI Vol. 93, Issue 2, 134–138 (Jan 2001), *available at* https://academic.oup.com/jnci/article/93/2/134/2906355.

JUULpods are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine—a fact not disclosed by Defendant.

66.     At the same time, as discussed above, the throat "hit" from nicotine salts is much lower than that for combustible tobacco products, making it easier to inhale.  Indeed, one study found that "[e]-liquids designed to combine high total nicotine level (addictive delivery) with … ease of inhalation[] are likely to be particularly problematic for public health.[28]

67.     Despite the above data, Defendant has failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

68.     For example, prior to releasing its new version of c-cigarette and JUULpods in 2015, JUUL provided press outlets with information regarding the products, as well as free JUUL products.  Among other websites that posted articles about JUUL prior to the product release, technology website TechCrunch posted a chart JUUL provided it that compares the results for two versions of the JUUL device: a generic "combustion cigarette" and a generic "traditional e-liquid."

///

---

[28] Duell Study at 431.

1
2
3
4
5
6
7
8
9
10
11
12
13



14     69.    JUUL posted a similar chart on its own website when it debuted the new

15  products.

16

17         ///

18

19

20

21

22

23

24

25

26

27



70.    Both charts, provided to TechCrunch and others prior to JUUL's 2015 product release and published by TechCrunch and others at that time, claim that, at its peak, JUUL products deliver approximately 25% less nicotine to the blood than a combustible cigarette. As discussed herein, that is false. The statements in JUUL's 2015 charts misrepresented the true nicotine delivered by JUUL's products and the resulting increased risk of nicotine addiction and severe health consequences resulting from high levels of nicotine consumption.

71.    JUUL further misrepresents the amount of nicotine delivered by its products, including JUUL's comparisons of JUULpods to "1 pack of cigarettes or 200 puffs," because JUUL's nicotine salt proprietary formula delivers higher concentrations of nicotine to a user's bloodstream.

72.     Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod.  If, as JUUL claims, this is equivalent to a single 20-cigarette pack, that implies 2 mg of nicotine per cigarette.

73.     JUUL's equivalency claim further assumes 10 puffs per cigarette (*i.e.*, 200 puffs per pack), or 0.2 mg (200 μg) of nicotine per puff.

74.     "Typically, a cigarette that delivers approximately one milligram of nicotine in smoke … retains 'about 14-20 milligrams of nicotine in the unsmoked rod,'" *USA v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 337 (D.D.C. 2006), for an overall delivery of 5-7% of the cigarette's actual nicotine content.  A study by the CDC found that in "commercial cigarette brands, nicotine concentrations ranged from 16.2 to 26.3 mg nicotine/g tobacco (mean 19.2 mg/g; median 19.4 mg/g)."[29]  Assuming an average of 19 milligrams of nicotine per cigarette, a pack of cigarettes contains on average 380 milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each JUULpod.  And the average pack would be expected to deliver only 5-7% (19-27 mg) of its nicotine content to the user. In line with this expectation, a study of thousands of smokers found smokers intaking between 1.07 to 1.39 milligrams per cigarette (21.4-27.8 mg per pack).[30]  This is less than half of the amount of nicotine contained in a JUULpod (*i.e.*, 2 mg per "cigarette" based on JUUL's stated concentration, or 200 μg per puff assuming 100% delivery).  Even with the

---

[29] Lawler *et al.*, *Surveillance of Nicotine and pH in Cigarette and Cigar Filler*, Tob. Regul. Sci. 3(Suppl 1): 101–116 (Apr 1, 2018), *available at* www.ncbi.nlm.nih.gov/pmc/articles/PMC5628511/.

[30] Jarvis *et al.*, *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI, Vol. 93, 2:134–138 (Jan 17, 2001), *available at* www.ncbi.nlm.nih.gov/pubmed/11208883.

slightly lower efficiency of delivery demonstrated in studies like the Reilly Study (about 82%, for averages of 164 µg per puff), this amounts to a substantially higher amount of nicotine that a human will absorb from a JUULpod than from smoking a pack of cigarettes.

75.     JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is, thus, false and misleading because the actual amount of nicotine consumed via JUULpods is as much as twice as high as that consumed through combustible cigarettes.

76.     Further, while a pack of cigarettes contains 20 cigarettes that a smoker must separately remove from the pack and light, a JUULpod can be inhaled without interruption. JUUL e-cigarettes do not have a manual or automatic "off" switch, unlike a combustible cigarette that self-extinguishes when finished.  And JUUL products often can be used indoors without detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks.  Thus, the device design facilitates and results in consumption of far more nicotine than would occur with cigarettes.

77.     Finally, JUUL failed to disclose additional risks posed by JUUL's "Cool" Mint and Menthol pods.  The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-like effects, including "cooling and anesthetic effects that

reduce the harshness of cigarette smoke."[31]  Mint and menthol could also "facilitate deeper and more prolonged inhalation," resulting in "greater smoke intake per cigarette."[32]

### E.     JUUL's Marketing Campaign

#### 1.     JUUL Learns from Big Tobacco and Employs Youth-Oriented Marketing Tactics Prohibited for Manufacturers of Combustible Cigarettes

78.     With a physical design that appealed to youth and a more powerful and addictive nicotine delivery system, all JUUL was missing was a plan to attract its target audience.  Again, JUUL took a page out of the big tobacco playbook.  According to Monsees, JUUL aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category."  Indeed, Monsees has admitted that JUUL studied tobacco industry documents.  In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."[33]

79.     One thing learned from the cigarette epidemic was that marketing played a substantial role in youth smoking initiation.  Big tobacco studied the propensities of youth and formulated content and strategies to attract and retain new, young smokers.  That marketing, including the depiction of young, attractive peers smoking cigarettes was, unfortunately, highly successful.

---

[31] Proctor, Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition, 500 (1st ed. 2011).

[32] *Id.* at 500-501.

[33] Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019) (the "Stanford Report").

80.     Notably, many of the practices employed by big tobacco are prohibited by the 1998 Master Settlement Agreement between big tobacco, government officials, and injured smokers. Specifically:

> Prohibition on Youth Targeting. No Participating Manufacturer may take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State.

81.     Among other activities, the Master Settlement Agreement prohibits in large part the use of cartoons in advertising, sponsoring of concerts or other events with an intended or actual audience containing youth, sponsoring sporting events, billboard advertising, and free samples outside of adult-only facilities. The Agreement also prohibits the use of third-parties or agents to carryout activities the tobacco manufacturer could not perform itself. JUUL is not subject to the Master Settlement Agreement.

82.     The Tobacco Control Act of 2009 banned cigarette sales to minors and placed other restrictions on marketing to youth, including banning tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, vending machine sales, free giveaways of sample cigarettes, and brand-name non-tobacco promotions items. The Tobacco Control Act also prohibits tobacco companies from making "modified risk" claims without scientific support and an FDA order. As discussed above, the FDA gained authority over e-cigarettes in 2016 but exercised its enforcement discretion to permit products previously on the market to remain on the market.

83.     Because JUUL was not subject to the Master Settlement Agreement, and not yet directly under the thumb of the FDA, JUUL was free to capitalize on marketing

practices known to be highly-successful at addicting youth to nicotine products. And capitalize it did.

84.    Nicknamed "Vaporized," JUUL's early marketing depicted flirtatiously posed young people holding JUUL products. JUUL's advertisements mimicked those of big tobacco and traditional cigarettes, including colorful ad images using eye-catching designs and youth-oriented imagery touting themes of being "cool," "carefree," "stylish," "attractive," "sexy," "pleasureful," "popular" and that JUUL e-cigarettes are "great tasting." JUUL associated its product with one of the trendiest products of all-time, the Apple iPhone. By calling it "the iPhone of e-cigarettes" on JUUL's website, social media, and email campaigns, JUUL portrayed its e-cigarette as a must have tech gadget.

///



85.     Among other print media, JUUL ran a full-paged spread in *Vice* magazine. Vice has marketed itself as the "#1 youth media company" in the world.  JUUL also advertised on a 12-panel display over Times Square.

---

[34] Stanford Report at 8.

  

86.     JUUL's marketing also included attractive young people distributing free JUULs at movie and music events.  The Stanford Report identified at least 25 JUUL "youth-oriented entertainment events, usually either music or cinema themed, whose primary purpose was to distribute free samples of JUUL devices and flavor pods to a youthful audience."[35]  The "average number of samples/event distributed equals 5,000+" JUUL Starter-Kits.[36]  That equates to 20,000 packs of cigarettes at each event, or 500,000 packs of cigarettes total.  Although JUUL claims its marketing changed after 2015, in December 2017 "JUUL tweeted an invitation for a 'demo event' for $1 in Miami."  And in April 2018, JUUL promoted an event where new users could learn "how to use your device and sample #juulpod flavors."  JUUL sampling event invitations followed JUUL's bright-colored, young-models template:

---

[35] Stanford Report at 5.
[36] *Id*. at 6.

 

87.   As the "Vaporized" campaign was rolled out, John Schachter with the Campaign for Tobacco-Free Kids "expressed concern about the Juul campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Mr. Schachter said: "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships, and various flavors."

88.   The highly-successful "Vaporized" campaign was created by JUUL's Creative Director Steven Baillie along with Cult Collective LP ("Cult Collective") and Grit Creative, LLC ("Grit"). Cult Collective has admitted the "Vaporized" campaign "created ridiculous enthusiasm." JUUL's "Vaporized" campaign failed to warn consumers about the risks of vaping and nicotine addiction or, remarkably, even that JUUL's products contained nicotine. When nicotine warnings were present, they were in low contrast, small font that

---

[37] *Id.* at 4.

was intended to be overlooked or, for internet-based advertisements, positioned such that smartphone users may not even see them without clicking for additional information.

### 2.   JUUL Uses Social Media to Inundate Youth

89.   Although JUUL utilized multiple outlets to reach its target audience with its "Vaporized" and similar youth-oriented marketing, perhaps the most successful strategy was JUUL's use of social media advertising to create a viral marketing campaign.

90.   "Viral marketing" is defined as "'marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic.'"[38]  Viral marketing is akin to word-of-mouth recommendations, accelerated exponentially by the network effect of the internet. The goal in a viral marketing campaign is to turn customers into unwitting salespeople who repeat a company's representations on its behalf.

91.   Companies may use different media to transmit their viral messaging, but generally, all viral marketing campaigns tend to share similar features, including (1) a simple message—typically implied by an image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message.

---

[38] Larson, *The Rise of Viral Marketing through the New Media of Social Media*, Liberty University, Faculty Publications and Presentations (2009), *available at* https://digitalcommons.liberty.edu/cgi/viewcontent.cgi?article=1009&context=busi_fac_pubs.

92.   Typically, a viral marketing campaign will begin with a "push" by the company seeking to advertise the product, and since the advent of social media, that push is typically done through the creation of new content on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform.[39]  A company that wants to push an ad on social media platforms has a few options.  First, the company can solicit followers to its social media pages, so that when the company posts to its own social media feed, the content would be delivered to those followers and to those who visited the company page.  Second, the company can purchase paid advertisements that are delivered to specified target audiences.  To amplify a message, companies can the use other tools, like paid influencers and hashtags, to blanket the target demographic.

93.   Companies seeking to advertise new products or reach a new demographic have discovered the power of the "like" and "share" features on social media, which allow users to promote content to their own audiences.  As Mark Zuckerberg, founder and Chief Executive Officer ("CEO") of Facebook explained: "Nothing influences people more than a recommendation from a trusted friend.  A trusted referral influences people more than the best broadcast message.  A trusted referral is the Holy Grail of advertising."

94.   Today's youth often are opposed to large, corporate product pushes, preferring more grassroots or start-up product offerings.  Thus, a viral marketing campaign such as that implemented by JUUL seeks to appear organic rather than corporate-driven.  JUUL's

---

[39] Skrob, *The viral marketing concept as a model for open source software to reach the critical mass for global brand awareness based on the example of TYPO3*, University of Applied Science Kufstein, Austria (Aug 2005), *available at* http://citeseerx.ist.psu.edu/viewdoc/ download?doi=10.1.1.494.8779&rep=rep1&type=pdf.

social media campaign, including the use of paid social media influencers and viral hashtag advertising, was highly-coordinated and focused to persuade those who use social media—youth—that JUULing was the latest cool trend and healthy.

95.     JUUL focused on social media because it knew that adolescents are the predominant users of social media. 95% of teens report having use of a smart phone and 88% have a computer.[40] "Roughly nine-in-ten teens go online at least multiple times per day," with 45% reporting they are "online on a near-constant basis."[41] 85% use YouTube.[42] 72% use Instagram.[43] 69% use Snapchat.[44] JUUL knew that viral marketing campaigns on social media prey on teenagers' need to fit in and appear cool to their friends. Following trends on social media, set by influencers and others held out as trendsetters and cool, is instinctive for teenagers.

96.     In addition, paid social media advertising can be tailored to a target audience, e.g., youth, based on data points collected by social media platforms. Those same data points also allow advertisers like JUUL to see who is viewing their ads. JUUL undoubtedly tracked who viewed its social media advertisements.

97.     The Stanford Report analyzed JUUL's marketing campaign between its launch in 2015 and fall 2018. The researchers scrutinized thousands of social media posts (Instagram, Facebook, Twitter), emails to consumers, and ads (including internet-based ads

---

[40] Anderson & Jiang, *Teens, Social Media & Technology 2018*, Pew Research Center (May 2018), *available at* https://www.pewinternet.org/2018/05/31/teens-social-media-technology-2018/.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

JUUL has since deleted).  The Report's conclusion is damning: ***JUUL's marketing was "patently youth-oriented.  For the next 2 ½ years it was more muted, but the company advertising was widely distributed on social media channels frequented by youth, was amplified by hashtag extensions, and catalyzed by compensated influencers and affiliates."*** [45]  Matt Myers, president of the Campaign for Tobacco-Free Kids observed: ***"It's impossible to review the data [in the paper] and conclude anything other than the marketing is the major reason this product became so popular among young people."***  As Massachusetts Attorney General Maura Healey said regarding her office's investigation into JUUL's marketing campaign: "This is about getting kids to start vaping, and make money and have them as customers for life."

98.     In addition to JUUL's countless postings on its own social media accounts, a highly effective strategy employed by JUUL was to hire the Social Media Influencers— social media personalities with large followers of the target demographic—to promote JUUL's products. [46]  As discussed, teenagers have a heightened need to follow social norms and be perceived as cool by their peers.  By using the Social Media Influencers, JUUL created the perception that its products were being voluntarily used and promoted by individuals to whom teenagers were likely to look for cues on how to behave.  JUUL created hashtags—#JUUL, #JUULvapor, #switchtoJUUL, #vaporized—to facilitate dissemination of

---

[45] Stanford Report at 1 (emphasis added).

[46] The identities of the Social Media Influencers are largely unknown to Plaintiff but within Defendant's possession. One influencer Plaintiff is aware of is Christina Zayas. *See* Nedelman, *et al.*, *#JUUL: How social media hyped nicotine for a new generation*, CNN (Dec. 19, 2018), *available at* https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html.

its youth-oriented marketing.  JUUL's Social Media Influencers would post youth-targeted advertising, often featuring images of young people JUULing, with JUUL's hashtags.

99.   As the Stanford Report found:

JUUL has employed influencers – social media users with sizable followings recruited to increase brand awareness and to inspire sales. Confirming that JUUL used influencers since its inception was a June 2015 listing for an Influencer Marketing Intern.  The job description makes clear: *"The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements ... to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc."*

Influencers are a form of paid promotion.  For example, an influencer may earn $1000 for each 100,000 followers.  A particularly well-documented example is that of DonnySmokes (Donny Karle, age 21), whose JUUL "unboxing" YouTube video garnered some 52,000 views.  With 120,000 subscribers on his YouTube channel, Mr. Karl was able to earn a good income stream from vapor companies before YouTube interrupted his channel.  In October 2018, JUUL's website still requests applications to *"Join the JUUL Influencers."*[47]

100.   JUUL also allowed third parties to use its trademark when it benefitted JUUL, even if the third party was promoting prohibited use of JUUL's products.  For example, Twitter user @JUULnation's posts on social-media platform Instagram included tips on how to conceal JUUL in school and dismissed efforts to combat use of JUUL's products by youth.  JUUL promoted @JUULnation on JUUL's own Instagram account.

101.   JUUL's social media advertising reached its target demographic.  The Surgeon General's Advisory on E-Cigarette Use Among Youth found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets

---

[47] Stanford Report at 19-20.

were under 18. The National Youth Tobacco Survey has found that 78.2% of middle and

high-school students—20.5 million youth—had been exposed to e-cigarette advertisements.

102.   JUUL also used an undisclosed "affiliate program" and the JUUL Affiliates to

attract customers to JUUL's website. The Stanford Report describes the program:

> JUUL has used an affiliate program which makes payouts to online sites
> which refer business to them. In the vaping industry, this most often takes the
> form of sites which review the product favorably and include a link to the
> product's website, especially to their *"buy now"* section. JUUL partnered with
> the company Impact Radius (https://impact.com/) whose goal is to: *"optimize
> partner marketing investments."* In their affiliation application, JUUL
> explained: *How it works: You get paid by advertising performance campaigns
> to your audience on your blog, website, newsletter, search landing page.
> Depending on the specific terms of our agreement you can get paid as
> frequently as daily using direct deposit into your bank account.* It goes on to
> specify: *"The purpose of this Agreement is to allow HTML linking between
> your web site and the JUULvapor.com web site" and "At all times, you must
> clearly represent yourself and your web sites as independent from
> JUULvapor.com."*
>
> JUUL offers payment of as much as 25% of net sales for new customers
> and 10% of net sales for existing customers. On October 31, 2018 JUUL
> halted its affiliate program. JUUL did not wait for an internet admirer to apply
> to its affiliates program. In response to a complimentary tweet on JUUL's
> Twitter feed, the company replied with an invitation for the individual to join
> the affiliates program 18 times (15 in 2017 and 3 in 2018).[48]

103.   JUUL also carried out extensive email campaigns—roughly 200 email

promotions between 2015 and 2018. But, like its other advertising, JUUL's email

subscription list was not age-restricted. Remarkably, until recently, consumers who failed

JUUL's age verification process on JUUL's website were still added to JUUL's mailing list

and emailed a coupon for a discounted JUUL Starter Kit.

---

[48] *Id.* at 22.

### 3.    JUUL's Point-of-Sale Advertising

104.    Another prong of JUUL's multi-faceted push to adolescents was its in-store product displays, or "point-of-sale" advertising.  JUUL knew that younger smokers were more likely to be influenced by point-of-sale advertising to make unplanned purchases.[49] Indeed, "youth who were frequently exposed to [point-of-sale] tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed."[50]  To start, JUUL designed packaging that would appeal to teenagers.  JUUL's bright, white packaging with clean lines resonated with youth who had been conditioned to such themes by companies like Apple in promoting its iPhones and iPads—products that teenagers associate with being trendy and stylish.

105.    Next, for years JUUL placed its products exclusively in gas stations as opposed to smoke shops.  JUUL knew that teenagers were more likely to frequent gas stations and, by contrast, may not even be allowed in smoke shops.  Finally, *JUUL had its retailers display JUUL products on retail shelves, not behind the counter with traditional cigarettes*. JUUL's point-of-sale advertising from 2015 through late 2018 failed to disclose that JUUL's products contained nicotine or otherwise adequately warn of the harmful effects of using JUUL's products.  JUUL went to great lengths to convey to consumers that JUUL's products were not comparable to traditional cigarettes but, rather, safe and intended for youth.

---

[49] Truth Initiative, *The truth about tobacco industry retail practices* (April 2017), https://truthinitiative.org/sites/default/files/media/files/2019/03/Point-of-Sale-10-2017.pdf.
[50] *Id*.

### 4.    JUUL's Youth-Oriented Flavoring

106.    JUUL further targeted youth by manufacturing, selling, and promoting an array of youth-oriented flavors for its JUULpods. JUULpods came in sweet flavors including mango, fruit medley, "cool" mint, "cool" cucumber and crème brulee. Research has shown that youth believe advertisements for flavored vaping and e-cigarette liquids and products are intended for them.[51] According to one survey, 81% of youth e-cigarette users reported that the first product they used was flavored and 81.5% reported product flavoring as a reason for use.[52]

---

[51] McKelvey *et al.*, *Youth say ads for flavored e-liquids are for them*, Addict Behav. Vol. 91, 164-170 (Aug. 29, 2018), *available at* www.ncbi.nlm.nih.gov/pubmed/30314868.

[52] Ambrose *et al.*, *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, JAMA 314(17):1871-1873 (Oct. 26, 2015), *available at* https://jamanetwork.com/journals/jama/fullarticle/2464690.






107.    Again, this was a page out of the big tobacco playbook.  A 1972 internal

memorandum at Brown & Williamson—party to the Master Settlement Agreement—

recommending the company consider sweet-flavored cigarettes, stated: "'It's a well known

fact that teenagers like sweet products.  Honey might be considered.'"[53]   Likewise, a 1979

memorandum at Lorillard—also party to the Master Settlement Agreement—considered how

to attract "younger" users.[54]  The memorandum concluded "less tobacco taste" was the

answer and suggested the company "investigate the possibility of borrowing switching study

---

[53] Tobacco Industry Quotes on Nicotine Addiction,
https://www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine
%20Addiction.pdf (last visited Sep. 12, 2019).
[54] Students Working Against Tobacco, *Tobacco Industry Quotes and Facts Related to Flavored Tobacco*,
http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes
%20and%20Facts.pdf (last visited Sep. 12, 2019).

data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal."[55]   And a 1978 report compiled for Lorillard found: "In psychological terms, what tastes and smells good, what one enjoys, cannot be 'so bad.'"[56]

108.   The FDA banned flavored cigarettes in 2009, stating: "flavored cigarettes are a gateway for many children and young adults to become regular smokers."  As Dr. Schuchat of the CDC recently testified: "We know that flavors are a principle attractant to young people."

109.   JUUL's advertising emphasized the flavors of its sweetened nicotine pods. JUUL even advertised JUULpods as part of a meal, to be paired with other foods.  In late 2015, JUUL began a food-based advertising campaign called "Save Room for JUUL."  A play on the expression "save room for dessert," JUUL's campaign focused on the JUULpods' sweet flavors, and pairing them with foods.  JUUL described its Crème Brulee nicotine pods as "the perfect evening treat" and encouraged users to "indulge in dessert without the spoon."  In one 2016 email, JUUL bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."

///

---

[55] *Id.*
[56] *Id.*



110.    JUUL similarly promoted the Fruit Medley pods using images of ripe berries. JUUL described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint." In a July 10, 2017 Facebook advertisement, JUUL urged customers to "start your week with cool mint juulpods." Along with the bright green caps of the "Cool" Mint JUULpods, the Facebook ad included an image of a latte and an iPad.

111.    JUUL even hired celebrity chefs to provide pairing suggestions for JUUL flavors. On Instagram and Twitter, JUUL boasted about "featured chef" Bobby Hellen creating a "seasonal recipe to pair with our brulee pod." On Facebook, JUUL posted a link to an article on porhomme.com about "what our featured chefs created to pair with our pod flavors." JUUL tweeted repeatedly about its flavors and encouraged its social media followers to share their preferred pairings.



112.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.  JUUL's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.  This comparison to coffee was an intentional effort to downplay the risks of JUUL's products, suggesting they were no more risky than coffee— a tactic utilized by tobacco companies for decades to equate nicotine with caffeine.



113.    By positioning JUULpods as a delicious treat rather than a system for delivering a highly-addictive drug with dangerous side effects, JUUL deceptively led consumers to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

114.    By modeling its nicotine pods' flavor profiles on sweets, naming its nicotine pods after those sweets, and using images of the sweets in JUULpod advertisements, JUUL conditioned viewers of its advertisements to associate JUUL with those foods. Through this conditioning process, Defendant sought to link the sight or mention of JUUL products to mental images of the fruits and desserts in JUUL's advertising, which would in turn trigger food-based physiological arousal including increased salivation and heart rate. These physiological responses, in turn, would make JUUL use more appealing.

### 5.    JUUL Attempts to Rewrite History

115.    In 2016, JUUL made some changes to its marketing, but the deception and intent to target youth remained. For instance, JUUL's marketing would often depict themes like socialization and romance or style and identity. Instagram and Facebook ads included photos of pop-star Katy Perry with a JUUL e-cigarette at the Golden Globes. But most glaring was what JUUL did not include in their advertising: adult smokers JUUL claimed it was targeting to switch from traditional cigarettes to JUUL.

116.    JUUL's more recent marketing has included live testimonials from adults who claim to have switched from cigarettes to JUUL. But according to Robert K. Jackler, M.D., one of the Stanford Report's authors: "The JUUL hashtag lives on. It's immortal. It's still

viral in peer-to-peer teen promotion." "The fact that Juul shut down its own social media

postings had little effect," Dr. Jackler said.

117.   After the FDA opened an investigation and lawsuits were filed, JUUL set out

to rewrite its history, JUUL added nicotine warnings to its product packaging in August

2018. Prior to that, they had only contained California Proposition 65 warnings indicating

that the product contains a substance known to cause cancer and a warning to keep

JUULpods away from children and pets, but nothing about the known effects, or unknown

long-term effects, of vaping nicotine salts.

118.   JUUL has removed from its website, and much of the internet, images of

glamorous young models seductively exhaling clouds of vapors.  JUUL's website now

features middle-age adults in non-glamorous settings and suggests that JUUL solely exists

for the benefit of adult smokers looking for an alternative.

119.   JUUL now markets its product as a smoking cessation device: "Switch to

JUUL."  But, as discussed below, it has not received FDA approval as a modified risk

tobacco product or as a nicotine replacement therapy, and JUUL's e-cigarette has not

participated in any FDA approval process analyzing its risks and benefits. JUUL's "Switch"

campaign, promoting the benefits of vaping JUULpods compared to combustible cigarettes

create a false impression that JUUL products had been approved as smoking cessation

devices and found to be safer than combustible cigarettes. That is false.

120.   While JUUL has also announced some half-hearted voluntary measures to

reduce access to young people, the cat cannot go back in the bag. The viral marketing

campaign and images live on, the candy flavors are still available, and the product remains

designed to maximize the nicotine delivery for young people, leading to devastating health consequences.

121.   After addicting scores of youth to its product, JUUL now claims its marketing was never geared towards youth.  But as a former senior manager at JUUL has admitted, JUUL was "well aware it could appeal to [teenagers]."  And, in fact, as JUUL's e-cigarettes went on sale in June 2015, it was quickly apparent that teenagers were seduced by the marketing and were picking up JUUL's addictive, harmful products in droves.  Indeed, some customers purchased more JUUL products than one could use, sometimes 10 or more devices.  Indeed, by the end of 2015, users had posted tens of thousands of videos on YouTube showing students how to "JUUL in school" without getting caught.

122.   On September 25, 2019, JUUL announced that it was "suspending all broadcast, print and digital product advertising in the U.S." and that JUUL would not fight the federal government's proposed U.S. ban on flavored e-cigarettes, which the FDA is set to begin implementing any day.  In addition, JUUL CEO Kevin Burns unexpectedly stepped down.  But, as discussed below, these actions were too late as JUUL's deceptive and illegal conduct had already succeeded in addicting a generation of America's youth to its nicotine products.  Indeed, demonstrating its callous attitude towards nicotine abuse, JUUL appointed K.C. Crosthwaite as its new CEO.  Crosthwaite is an Altria—big tobacco—veteran.  A week later, JUUL hired another Altria executive, 24-year Altria veteran Joe Murillo, as JUUL's new chief regulatory officer.

### 6.   JUUL's Marketing was Deceptive and Failed to Warn of the Risks Associated with Use of its E-cigarette and JUULpods

123.   From its product release in 2015 and continuing through today, JUUL's marketing, discussed above, has misrepresented and concealed material information regarding its products and their operation.  Specifically, as detailed above, JUUL misstated and omitted material facts in social media posts—both its own posts and posts of its Social Media Influencers, advertisements on JUUL's website, email messages, print materials including 2015 full-page ads in *Vice* magazine, point-of-sale advertising, free JUUL distribution events, and "education" programs to schools and youth (discussed below).

124.   JUUL's marketing misrepresents or fails to adequately disclose that its products contain nicotine or how much nicotine JUUL products deliver to a user's bloodstream, including as compared to combustible cigarettes, as well as the benzoic acids levels.  JUUL's marketing further omitted the increased risk of addiction, physiological effects, and other severe health risks the higher-than-disclosed levels of nicotine delivery pose to a JUUL user.  Instead, JUUL intentionally created a misleading impression that JUUL's products were intended for youth, were totally safe or at least safer than combustible cigarettes, and were not a nicotine delivery device but, rather, a trendy tech product that should be associated with products like the wildly popular iPhone.

125.   As the FDA made clear in a September 9, 2019 warning letter, JUUL violated the Federal Food, Drug, and Cosmetic Act when it advertised its e-cigarettes and nicotine juice as modified risk tobacco products without an appropriate FDA Order in effect.  JUUL's

"Switch" campaign, like its earlier marketing, thus, continues the parade of misstatements and omissions of material facts regarding the design and use of JUUL products.

126.    To this day, JUUL has not disclosed the true health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of young people in harm's way.

### F.    JUUL Targets Schools

127.    In addition to the purposeful targeting of student-aged youth generally, JUUL made concerted efforts to market to students, including direct misstatements and omissions to students on school grounds.

128.    In January 2018, The Boulder Daily Camera published a front-page story about local educators' growing concerns over their students' use of JUUL.  Five days later, the principal at Nederland Middle-Senior High School in Boulder, Colorado, Carrie Yantzer, received a surprising email from someone introducing themselves as Bruce Harter, a former educator.  Mr. Harter claimed he was working with JUUL in developing anti-vaping curriculum for schools.  Mr. Harter said he "read about the challenges you're having with JUUL" and offered a free, three-hour curriculum provided by JUUL purportedly aimed at discouraging vaping amongst teens.  Ms. Yantzer was not the only school administrator to get such a letter.

129.    During "educational" presentations to students like the one proposed to Ms. Yantzer, representatives of JUUL sought to raise awareness of JUUL's addictive products surreptitiously and directly misrepresented or omitted the health risks associated with use of JUUL products to students.  For example:

- JUUL "was much safer than cigarettes and that "FDA would approve it any day."

- JUUL was "totally safe."

- A student "…should mention JUUL to his [nicotine-addicted] friend…because that's a safe alternative than smoking cigarettes, and it would be better for the kid to use."

- "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes…and that…would happen very soon…."[57]

130.   In addition, JUUL contracted with organizations such as LifeSkills, Inc. ("LifeSkills") to purportedly provide health education to youth.  In the instance of LifeSkills, the goal was to reach a thousand youths in Baltimore, Maryland.  JUUL's relationship with LifeSkills included at least the second half of 2018 and appears to have cost JUUL tens or hundreds of thousands of dollars.  JUUL also appears to have sponsored a summer camp for kids aged grades 3-12 put on by The Freedom & Democracy Schools Foundation, Inc., in June 2018.  In exchange for its payment of $134,000, JUUL would receive data, including the students' general knowledge of health and risky behaviors, on the camp's participants.

131.   JUUL's "educational" programs were marketing events, plain and simple. JUUL sought to raise awareness of its flavored, low-irritation nicotine products with students.  Not surprisingly, that very same tactic—purportedly educating youth about the dangers of a product in order to market the product to them—was used by big tobacco in marketing traditional cigarettes.

---

[57] FDA News Release, *FDA warns JUUL Labs for marketing unauthorized modified risk tobacco products, including in outreach to youth* (Sep. 9, 2019), *available at* https://www.fda.gov/news-events/press-announcements/fda-warns-juul-labs-marketing-unauthorized-modified-risk-tobacco-products-including-outreach-youth.

### G.     JUUL's Illegal Conduct Gives Rise to a Youth E-cigarette Epidemic and Puts a Generation at Risk

132.    Smoking remains the leading cause of preventable death in the U.S., killing more than 480,000 people a year.  Each year, cigarette smoking causes about one in every five deaths in the U.S.

133.    The FDA and CDC characterize teen vaping as an epidemic.  In a September 11, 2018 statement announcing unprecedented steps to combat e-cigarette use by youth, FDA Commissioner Dr. Scott Gottlieb observed: "[e]-cigs have become an almost ubiquitous – and dangerous – trend among teens."  As to drivers of that epidemic, Dr. Gottlieb stated: "[w]e know that the flavors play an important role in driving the youth appeal."  Dr. Gottlieb admonished JUUL and other e-cigarette manufacturers: "I've been warning the e-cigarette industry for more than a year that they needed to do much more to stem the youth trends.  In my view, *they treated these issues like a public relations challenge* rather than seriously considering their legal obligations, the public health mandate, and the existential threat to these products."

134.    U.S. Surgeon General Vice Adm. Jerome M. Adams  followed suit, issuing an advisory: "stressing the importance of protecting children from a lifetime of nicotine addiction and associated health risks by immediately addressing the epidemic of youth e-cigarette use."  The advisory notes the appeal of flavored e-cigarettes to youth, as well as the harmful chemicals used to make certain of the flavors.  The Surgeon General singled out JUUL and its commanding market share, noting:

> One of the most commonly sold USB flash drive shaped e-cigarettes is JUUL, which experienced a 600% surge in sales during 2016-2017, giving it the

greatest market share of any e-cigarette in the U.S. by the end of 2017. … All JUUL e-cigarettes have a high level of nicotine. … [JUUL's] products also use nicotine salts, which allow particularly high levels of nicotine to be inhaled more easily and with less irritation than the free-base nicotine that has traditionally been used in tobacco products, including e-cigarettes. This is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine through these products and also could make it easier to progress to regular e-cigarette use and nicotine dependence. However, despite these risks, ***approximately two-third of JUUL users aged 15-24 do not know that JUUL always contains nicotine***. (emphasis added)

135.    According to a recent survey of adolescent drug use, 20.9% of 12th graders, 16.1% of 10th graders, and 6.1% percent of eighth graders had vaped nicotine in the previous 30 days.[58] According to the CDC, in 2018 3.05 million high-schoolers and 570,000 middle-schoolers used e-cigarettes.[59] Those figures are up from 220,000 and 60,000 in 2011.[60] E-cigarette use increased 78% among high-school students and 48% among middle-school students from 2017 to 2018.[61]

136.    A recent study out of the University of Michigan revealed: "[i]ncreases in adolescent vaping from 2017 to 2018 were the largest ever recorded in 43 years for any adolescent substance use outcome in the U.S."[62] The study noted that the percentage of 12th graders who "reported ***vaping nicotine*** in the past 30 days nearly doubled, rising from 11%

[58] Stein, *Teen Vaping Soared in 2018*, NPR (December 17, 2018), https://www.npr.org/sections/health-shots/2018/12/17/676494200/teen-vaping-soared-in-2018 (last visited September 12, 2019).
[59] Cullen, *et al.*, *Use of Electronic Cigarettes and Any Tobacco Product Among Middle and High School Students—United States, 2011-2018*, MMWR Morb Mortal Wkly Rep 2018;67:1276-1277 (Nov. 16, 2018), *available at* https://www.cdc.gov/mmwr/volumes/67/wr/mm6745a5.htm.
[60] *Id*.
[61] *Id*.
[62] *National Adolescent Drug Trends 2018*, Institute for Social Research, The University of Michigan (Dec. 17, 2018), https://isr.umich.edu/news-events/news-releases/national-adolescent-drug-trends-in-2018/ (last visited Sep. 12, 2019).

to 21%" between 2017 and 2018.[63]  That increase is "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade."[64]

137.   As a direct result of JUUL's deceptive marketing and failure to warn of the harms associated with e-cigarettes and nicotine, from 2015 to 2018, between only 14% to 18% of 12th graders perceived using e-cigarettes regularly as posing great risk of harm.[65] Those figures compared to a range of 74% to 78% who saw great risk of harm from smoking one or more packs of traditional cigarettes per day.[66]  Similarly, an April 2018 study found: "63 percent of JUUL users did not know that the product always contains nicotine."[67]

138.   CDC Director Dr. Robert R. Redfield expressed concern in a February 11, 2019 statement: "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made reducing tobacco use.  It's putting a new generation at risk for nicotine addiction."  Hundreds of vaping-related illnesses have been reported, including several deaths.

## H.   Schools Are Uniquely and Disproportionately Harmed by JUUL's Conduct

139.   JUUL's deceptive and illegal conduct has caused unique harm to Plaintiff. Because Defendant targeted school-aged youth and even sought directly to raise awareness of its products on school campuses through "education" presentations, schools like those in

---

[63] *Id.*

[64] *Id.*

[65] Monitoring the Future, National Adolescent Drug Trends Press Release: Text & Tables, https://monitoringthefuture.org/data/18data/18drtbl11.pdf (last visited Sep. 12, 2019).

[66] *Id.*

[67] Truth Initiative, *Data suggest teens who use JUUL are not just experimenting* (Nov. 1, 2018), https://truthinitiative.org/research-resources/emerging-tobacco-products/data-suggest-teens-who-use-juul-are-not-just (last visited Sep. 12, 2019).

Plaintiff's district are the epicenter of the youth vaping epidemic.

140.    An April 20, 2018 article in *The Wall Street Journal*, titled "Schools and Parents Fight JUUL E-Cigarette Epidemic," described the problems parents and schools are facing with the meteoric rise of nicotine use by America's youth:

> At Northern High School in Dillsburg, Pa., Principal Steve Lehman's locked safe, which once contained the occasional pack of confiscated cigarettes, is now filled with around 40 devices that look like flash drives.
>
> The device is called a JUUL and it is a type of e-cigarette that delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes. It has become a coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers, parents and school administrators by surprise.
>
> \*       \*       \*
>
> After two decades of declining teen cigarette use, "JUULing" is exploding. The JUUL liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes. JUUL Labs Inc., maker of the device, says one liquid pod delivers nicotine comparable to that delivered by a pack of cigarettes, or 200 puffs—important for adult smokers trying to switch to an e-cigarette. It is also part of what attracts teens to the product, which some experts say is potentially as addictive as cigarettes and has schools and parents scrambling to get a grip on the problem.

141.    A February 13, 2018 article published by the Lawrence (Kansas) Free State High School's Free Press Online, described the seduction of JUUL products and students' growing addiction:

> Since most vape juices contain nicotine, laws have been put in place to keep minors from using the potentially addictive substance. The Food and Drug Administration prohibits anyone under the age of 18 from using any kind of vape product. Despite the current legislation, many minors are still able to obtain vaping devices. At Free State, underage use of vapes is quite typical. ***Out of 95 students surveyed, 50% of them said that the illegal use of vape products is very common***. Students are able to get their hands on vape products with ease, as there are many effective methods of buying them unlawfully.

*     *     *

One of the reasons why vaping has become so popular is the "cloud" the user makes after exhaling the substance. The vapor is cooler than a traditional cigarette, and some students are fascinated with the many different things you can do with it, an anonymous senior said.

"I think if you're doing it with people that you feel comfortable with then it's just a good time. People are fascinated by the cloud and the tricks." an anonymous senior said.

Another attractive characteristic of vaping is the buzz that the user gets after inhaling the substance. It can be described as a short-term head high.

"It's almost like being drunk—you feel it in your head and you just kind of wobble," senior Isaiah Jacobs said. "It's a dizzy feeling. It feels nice."

The buzz is caused by nicotine which the vape juice contains. To a new user, vaping is an easy way to get a strong high. After continual use, users build up an immunity and must ingest more nicotine to reach their desired state. This is called a nicotine addiction and all consumers, especially minors, are susceptible to this craving according to the U.S. National Library of Medicine. Some students have become habitual users, causing them to spend time and money feeding their habit. Students who vape recognize that many of their peers have an addiction but still choose to partake in the activity, disregarding the risk.

"Some [people who vape] will admit it," senior Isaiah Jacobs said. "You can tell they are addicted when they spend all their money and time on it, just like people who smoke cigarettes or drink alcohol." (emphasis added)

142.    A March 16, 2019, article on azcentral.com, titled "As e-cigarette use climbs, schools address the problem with vape detectors, addiction experts," discussed the rise in vaping at Arizona schools and the lengths schools were going to prevent vaping by students. As the title indicates, vaping detectors and addiction experts were among the common steps. But the article further noted the expense of the vaping detectors and the unavoidable fact that many schools cannot afford to install them. And as one Arizona school administrator noted, detectors "'are just one part of a package.'"  Will Humble, Executive Director of the Arizona

Public Health Association recently stated: "'Just ask any high school or college student about the prevalence of vaping, and you'll discover that we're facing an epidemic.'" Approximately 51% of Arizona high school students have used an e-cigarette.

143.    A July 26, 2019 article in *The Washington Post* noted the measures some schools were taking to combat JUULing by students:

> Many schools are at a loss for how to deal with Juuls and other e-cigarettes. Some educators report increases in the number of students being suspended after they're caught with e-cigarettes.
>
> Desperate school administrators have banned USB drives because they're indistinguishable from Juuls. Others removed bathroom doors because teens were regularly gathering there to vape, and some have even started searching students.
>
> Jonathon Bryant, chief administrator of Lincoln Charter School in North Carolina, estimated that three-quarters of suspensions in the just-completed academic year were related to vaping, and some students were suspended more than once.

144.    Similarly, a September 19, 2019, *USA Today* article noted that in the Lee County School District in Fort Myers, Florida, "[t]obacco use or possession offenses in the 95,000-student district increased almost five-fold" in the 2017-18 school year. Among other steps taken to address student vaping, the district "opened a new center where students suspended for such offenses are sent for 20 days." Likewise, the article reported that a New York school district resorts to a "'therapeutic intervention'" after a student's second vaping offense.

145.    As noted in *The Washington Post*, *USA Today*, and countless other instances, schools are taking an array of actions to address student vaping. Those actions have included camera surveillance near restrooms or elsewhere in schools, removing restroom doors,

limiting the number of students in a restroom at once, limiting the time students are allowed to spend in the restroom, assigning teachers or administrators to monitor restrooms, hiring additional faculty to monitor for student vaping, use of specialized detectors in restrooms or elsewhere in the schools, student and parent vaping-education programs, specialized student counseling, and after-school programs.

146. As one Tucson Unified official put it recently: "***It is the most disruptive behavioral situation we deal with in high schools***…. Confiscating product, calling parents, taking teachers out of classrooms to fill out witness statements, searching backpacks, routing students to social workers for tobacco prevention programs, I mean I can go on and on and on.'" Similarly, a Tucson Unified Board of Education member said: "'There is so much time and resources going towards this that we cannot afford.'"

147. Plaintiff has expended, is expending, and will need to expend in the future significant resources to combat skyrocketing use of JUUL products by students. Steps to prevent use of JUUL products and help students that are addicted are costly and time consuming for school districts like Plaintiff who have limited resources. And because JUUL's marketing to youth was so effective and the resulting rise in student vaping was so quick, little research exists on the effectiveness of prevention and cessation methods. Schools are, thus, forced to attack the epidemic from multiple angles, each requiring significant expenditures of their limited resources.

148. Student use of JUUL products on school grounds has resulted in increased student suspensions and absences. Because school funding is often related to the number of students enrolled and present, suspensions and absences may decrease the amount of funding

a school receives.  Similarly, for those students addicted to JUUL, the per-student cost to educate is increased as schools take the necessary actions to help addicted students quit JUUL's highly-addictive nicotine products.

149.    The highly-addictive nature of JUUL's products will require years of expensive actions by school districts to adequately address the epidemic.  Indeed, it took decades and billions of dollars to see a meaningful decline in cigarette use.

## I.    JUUL Has Experienced Extraordinary Financial Success at the Expense of America's Youth, Parents, and Educators

150.    With skyrocketing revenue gains, JUUL controls nearly three quarters of the e-cigarette market.  In 2017, JUUL's revenues grew by an astounding 700% to $200 million. JUUL's 2018 revenue continued to climb, hitting the $1 billion mark.  And despite growing restrictions and regulations in the U.S., JUUL forecasts revenue of over $3 billion for 2019.

151.    In December 2018, Altria Group, Inc. ("Altria"), the parent of Phillip Morris USA, Inc. ("Phillip Morris") invested $12.8 billion in JUUL, amounting to a 35% stake. Altria's investment translates to a $38 billion valuation for JUUL.

152.    Ironically, Altria's announcement of its stake in JUUL came just weeks after Altria announced it would remove its e-cigarette products from the market to purportedly address the youth vaping epidemic.

153.    In exchange for Altria agreeing to provide certain paid services to JUUL for at least six years, Altria agreed to a non-competition obligation with JUUL.  Altria and JUUL also entered into a services agreement.

154.    Under the agreements, Altria will, among other things, provide services to

JUUL with respect to logistics and distribution, access to retail shelf space, youth vaping "prevention," cigarette pack inserts and onserts, regulatory matters and government affairs. JUUL's access to Altria's retail shelf space will allow JUUL products to appear alongside traditional cigarettes like Phillip Morris's Marlboro brand, the country's most popular cigarette.

155.   In addition, Philip Morris will send JUUL marketing messages to Phillip Morris's database of traditional cigarette smokers' mailing and email addresses.

156.   On a December 20, 2018 conference call, Altria's CEO Howard Willard said Altria was "fortunate to be the tobacco company that's partnered up with JUUL" and that Altria's infrastructure, including its "leading sales organization," would help accelerate JUUL's growth and financial performance, to the benefit of both JUUL and Altria.

157.   According to Dr. Jackler, the joining of JUUL and Marlboro brings together "the two dominant players in the teenage nicotine addiction market, i.e., cigarettes and vaping. This powerful combination constitutes a clear and present danger to youth."

**J.    Government Investigations and Regulatory Actions Seek to Hold JUUL Accountable and Combat the Teen JUUL Epidemic**

158.   In April 2018, the FDA announced it was investigating JUUL's marketing efforts. The FDA requested JUUL's research and marketing documents, including focus group data and toxicology reports, and whether design features and ingredients appeal to specific age groups.

159.   On September 12, 2018, the FDA sent letters to five e-cigarette manufacturers that represent more than 97% of the current market. JUUL was among those manufacturers.

Dr. Gottlieb stated these companies are "now on notice by the FDA of how their products are being used by youth at disturbing rates." The FDA also requested "the manufacturers of these brands and products to come back to the FDA in 60 days with robust plans on how they'll convincingly address the widespread use of their products by minors." Dr. Gottlieb ordered the companies to "demonstrate that they're truly committed to keeping these [e-cigarettes] out of the hands of kids and they must find a way to reverse this trend."

160.    On September 31, 2018, the FDA conducted an unannounced inspection of JUUL's headquarters in San Francisco. The FDA sought more information about JUUL's sales and marketing practices.

161.    In an October 25, 2018 public letter to the FDA, Altria's Willard said "we share [the FDA's] concerns and … are alarmed about the reported rise in youth e-vapor use to epidemic levels." ***Altria admitted that "pod-based products significantly contribute to the rise in youth use of e-vapor products."***

162.    In response to mounting criticism and pressure, in November 2018, JUUL stated it "stopped accepting retail orders for our Mango, Fruit, Crème, and Cucumber JUUL pods to the over 90,000 retail stores that sell our product." But JUUL continues selling those flavors on its website and continues selling the highly-popular Mint flavor in retails stores. An April 2018 survey indicated that JUUL's "cool" mint flavor was the third-most popular flavor amongst JUUL users aged 12-17.[68]

---

[68] Truth Initiative, *JUUL fails to remove all of youth's favorite flavors from stores* (Nov. 15, 2018), *https://truthinitiative.org/research-resources/emerging-tobacco-products/juul-fails-remove-all-youths-favorite-flavors-stores* (last visited Sept. 9, 2019).

163.    In June of 2019, San Francisco became the first major city to ban the sale and distribution of e-cigarettes that have not undergone pre-market review by the FDA.  JUUL's e-cigarettes have not undergone that review.  San Francisco City Attorney Dennis Herrera said the ban is a step toward preventing "another generation of San Francisco children from becoming addicted to nicotine."

164.    On July 24 and 25, 2019, the United States House of Representatives Committee on Oversight and Reform held hearings at which JUUL executives and anti-tobacco witnesses testified.  The hearings sought to investigate "JUUL's role in the youth nicotine addiction epidemic, marketing to youth, misleading health claims, and new partnerships with traditional tobacco companies."  The hearings included appearances from students and parents who testified that JUUL representatives spoke at their schools, telling students that JUUL was "totally safe," "much safer than cigarettes," and that a student "should mention JUUL to his [nicotine-addicted] friend."  *See supra*, §IV.K.

165.    In August 2019, a *The Wall Street Journal* article, titled "JUUL's Marketing Under Scrutiny As Vaping Increases Among Teens," revealed a Federal Trade Commission ("FTC") probe into JUUL's use of "influencers and other marketing to appeal to minors" and whether "Juul engaged in deceptive marketing."  The probe began before the agency's antitrust review of Altria's 35% stake in JUUL, which Altria purchased in December 2018.  The FTC is reportedly considering seeking monetary damages.

166.    In September 2019, Michigan became the first state to ban flavored e-cigarettes. Michigan Governor Gretchen Whitmer ordered the ban in response to the state's health department finding youth vaping constituted a public health emergency and marketing

targeting youth.  Whitmer banned misleading descriptions of vaping products as "clear,"

"safe," and "healthy."  "Companies selling vaping products are using candy flavors to hook

children on nicotine and misleading claims to promote the belief that these products are

safe," Ms. Whitmer said.  Bills to prohibit sales of flavored vaping products have been

introduced in California and Massachusetts.

167.   A September 23, 2019, *The Wall Street Journal* article revealed that JUUL was

the subject of a federal criminal probe.

**K.   The FDA Issues a Warning Letter Outlining JUUL's Deceptive Marketing and Targeting of Schools**

168.   On September 9, 2019, the FDA issued a Warning Letter to JUUL ordering

JUUL to stop making unproven claims for its products.  The FDA outlined violations of the

Federal Food, Drug, and Cosmetic Act by JUUL when JUUL advertised its e-cigarettes and

nicotine juice as modified risk tobacco products without an appropriate FDA Order in effect.

The Warning Letter highlighted statements JUUL made directly to students:

1.   A JUUL representative speaking with students at his presentation stated that JUUL "was much safer than cigarettes" and that "FDA would approve it any day."

2.   The JUUL representative speaking with students at his presentation called JUUL "totally safe."

3.   The JUUL representative speaking with students at his presentation stated that a student "…should mention JUUL to his [nicotine-addicted] friend…because that's a safer alternative than smoking cigarettes, and it would be better for the kid to use."

4.   The JUUL representative speaking with students at his presentation stated, "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes…and that…would happen very soon…."

Referring to your ENDS products as "99% safer" than cigarettes, "much safer" than cigarettes, "totally safe," and "a safer alternative than smoking cigarettes" is particularly concerning because these statements were made directly to children in school. Our concern is amplified by the epidemic rate of increase in youth use of ENDS products, including JUUL's products, and evidence that ENDS products contribute to youth use of, and addiction to, nicotine, to which youth are especially vulnerable.

169.    The FDA issued a separate letter to JUUL CEO Kevin Burns, requesting "documents and information from JUUL Labs, Inc. (JUUL) regarding JUUL's marketing, advertising, promotional, and educational campaigns, as well as certain product development activity." The FDA's letter and news release chided JUUL for its role in the youth vaping epidemic, noting "[s]ome of this youth use appears to have been a direct result of JUUL's *product design and promotional activities* and outreach efforts," in particular, its outreach efforts to students. The FDA's September 9, 2019 letter highlighted specific incidents of concerning "educational engagement and outreach," requesting documents and explanations regarding:

1.   Ms. Meredith Berkman, Co-founder, Parents Against Vaping e-cigarettes (PAVe), testified that, "In California, a retired school superintendent was offering schools in his state and in Massachusetts money if they would implement the anti-JUUL curriculum that…a man named Bruce Harder was offering on JUUL's behalf."

2.   On July 24, 2019, Dr. Robert Jackler, M.D., Professor at Stanford University School of Medicine, testified that, "Altria may provide services to JUUL with respect to…youth vaping prevention…."

3.   On July 25, 2019, in response to questions from Chairman Krishnamoorthi about JUUL's program to pay schools $10,000 or more to use a JUUL youth prevention curriculum, Ms. Ashley

Gould, Chief Administrative Officer, JUUL Labs, Inc., testified:
"That is not currently the case. We ended that program in the fall
of 2018," and that, "...there were six schools that received
funding from JUUL to implement programming to prevent teen
vaping...."

4.      In addition, in response to questions from Chairman
        Krishnamoorthi about internal JUUL correspondence in 2018
        about setting up a booth at a school health fair, Ms. Gould
        testified that JUUL ended its youth prevention program.

5.      In response to questions about JUUL's agreement to pay the
        Richmond, California Police Activities League (RPAL) $89,000
        to use its youth prevention curriculum in the RPAL youth
        program, which is for 12- to 17-year-olds who face suspension
        from school for using e-cigarettes, Ms. Gould testified that JUUL
        ended its youth prevention program.

6.      Further, in response to questions about JUUL providing grants to
        youth programs, such as a $134,000 grant for a summer program
        at a charter school in Baltimore, Maryland, for 80 students in
        grades 3 – 12, and for which the school agreed to provide JUUL
        with the students' data (e.g., surveys, journals, activity logs), Ms.
        Gould testified that she, "...would have to check the contracts,
        but whatever grants were made were focused on youth
        prevention efforts."

7.      Moreover, in response to questions about JUUL's agreement
        with Life Skills, Inc., to partner with church groups to provide
        health education to a thousand youth in Baltimore, even though
        internal JUUL correspondence indicated the company was aware
        that tobacco companies promoted such initiatives in the 1990s,
        Ms. Gould again testified that JUUL ended its youth prevention
        program.

8.      In addition, in response to questions about JUUL's contract with
        a consulting group to promote cessation programs run by
        community-based groups, including veterans' organizations, Ms.
        Gould testified that she would need to review the documents
        being referenced.

170.    In a statement issued the same day, Acting FDA Commissioner Dr. Norman Sharpless put it bluntly: JUUL has "*ignored the law, and very concerningly, has made some of these statements in school to our nation's youth*."

## V.    CAUSES OF ACTION

### Count I
### Violation of the Racketeer Influenced Corrupt Organizations ("RICO") Act § 1962(a), (c) & (d)

171.    Plaintiff incorporates by reference all preceding paragraphs.

172.    Defendant is a "person" under 18 U.S.C. §1961(3).

173.    Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

174.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

175.    Section 1962(d) makes it unlawful for "any person to conspire to violate" §§ 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

176.    The enterprise, the activities of which affected interstate and foreign

70

commerce, was comprised of an association in fact of persons consisting of JUUL, Cult Collective, Grit, Impact Tech, Inc. ("Impact Tech"), LifeSkills, the Social Media Influencers, the JUUL Affiliates, JUUL product manufacturers, JUUL distributors, and JUUL retailers (collectively, the "JUUL Youth Marketing Enterprise").

177.   Cult Collective is a marketing agency headquartered in Calgary, Alberta.

178.   Grit is a marketing agency incorporated in Kentucky and headquartered in Frankfort, Kentucky.

179.   Impact Tech is an advertising and affiliate marketing company whose self-described mission is "to deliver disruptive innovations in technology to help our clients successfully navigate the ever-changing, digital landscape and grow their business." Impact Tech maintains U.S. offices in New York, California, Ohio, and Washington.

180.   JUUL, in concert with Impact Tech, utilized the deceptive affiliate program, described above, whereby purportedly independent entities—the JUUL Affiliates—were to promote JUUL products and steer would-be consumers to JUUL's web site. The JUUL Affiliates were compensated for their services, as was Impact Tech for facilitating JUUL's affiliate program.  JUUL expressly directed the JUUL Affiliates to not disclose their affiliation with JUUL.

181.   LifeSkills is a consulting group with whom JUUL contracted to purportedly provide health education to a thousand youths in Baltimore, Maryland.  As discussed herein, JUUL's "education" programs directed at youth, and schools in particular, were marketing programs designed to promote and encourage JUUL use.

182.   The JUUL Youth Marketing Enterprise functions to achieve a shared purpose:

a scheme to deceive youth regarding the health risks and characteristics of JUUL e-cigarettes and JUULpods to encourage youth use of JUUL products, to enable use of JUUL products on school premises and during class, to downplay or conceal the dangers posed by nicotine use, to design a product that facilitated youth e-cigarette use and initiation of use by non-smokers, to conceal the unparalleled potency of JUUL's e-cigarette, to addict youth to JUUL products, and to gain financially, through unlawful means.

183.   JUUL misstated and omitted material facts in social media posts—both its own posts and posts of its Social Media Influencers, advertisements on JUUL's website, email messages, print materials including 2015 full-page ads in *Vice* magazine, point-of-sale advertising, free JUUL distribution events, "education" programs to schools and youth, and product packaging.

184.   The JUUL Youth Marketing Enterprise misrepresented or failed to adequately disclose that its products contained nicotine or how much nicotine JUUL products deliver to a user's bloodstream, including as compared to a combustible cigarette, as well as the benzoic acids levels JUULpods contain. JUUL further omitted the increased risk of addiction, physiological effects, and other severe health risks the higher-than-disclosed levels of nicotine delivery pose to a JUUL user. Instead, JUUL intentionally created a misleading impression that JUUL's products were intended for youth, were totally safe or at least safer than combustible cigarettes, and were not a nicotine delivery device but, rather, a trendy tech product that should be associated with products like the wildly popular iPhone.

185.   The JUUL Youth Marketing Enterprise violated the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 387b(8), 387k(a), as amended by the Tobacco Control Act, by

advertising JUUL's e-cigarettes and nicotine juice as modified risk tobacco products without an appropriate FDA Order in effect, *i.e.* widely disseminating misleading statements about the safety of JUUL products.

186.    These deceptive acts were taken with the express intent of growing JUUL's market share and increasing JUUL's revenue, thereby causing financial gain to each of the JUUL Youth Marketing Enterprise's constituents. In addition to enhancing the fortunes of its members, some of the increased revenues were used to operate and expand the JUUL Youth Marketing Enterprise.

187.    Each member of the JUUL Youth Marketing Enterprise was associated with an illegal enterprise, and conspired, conducted, and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343, all in violation of the RICO Act, 18 U.S.C. §§1962(a), (c)-(d). These acts, committed by interstate wire and through the mails, include: (1) sending and receiving thousands of statements over a number of years that contained deceptive statements regarding JUUL's e-cigarettes and JUULpods, the effects of nicotine use, the likelihood of becoming addicted to nicotine use, the design of JUUL's e-cigarettes, the amount of nicotine and other chemicals in JUULpods, and that JUUL's e-cigarettes were intended for use by adults who were already addicted to nicotine rather than by teens who were new nicotine users; and (2) sending payments over that same time to further and guarantee the success of the deceptive acts described in (1).

188.   Each member of the JUUL Youth Marketing Enterprise profited from the enterprise, and Plaintiff suffered injury to its property because it has incurred substantial expense, is incurring substantial expense, and will continue to incur substantial expense in mitigating and combatting the harmful effects resulting from JUULing by students, including increased security and monitoring protocols, student suspensions and other disciplinary programs, and educational programs necessary to correct the JUUL Youth Marketing Enterprise's deceptive and illegal marketing.  The members of the JUUL Youth Marketing Enterprise used the proceeds from their deceptive acts to further the scheme by, among other things, expanding the depth and breadth of the deceptive marketing.  For example, JUUL began offering to sponsor purportedly education-related activities under the guise of preventing underage use of e-cigarettes.  In reality, JUUL sought to raise awareness of its products and gain additional student users.

189.   The members of the JUUL Youth Marketing Enterprise conspired to deceive Plaintiff.

190.   The JUUL Youth Marketing Enterprise has existed since at least 2015.  It has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.  Each member's participation in the JUUL Youth Marketing Enterprise is necessary for the successful operation of the deceptive marketing scheme and the financial gains that resulted therefrom.

191.   Plaintiff has sustained injury to its property by reason of the acts and conduct of Defendant alleged in this Complaint, including its loss of money in funding mitigation and

remedial programs regarding JUULing by students which but for the deceptive marketing and other acts of the JUUL Youth Marketing Enterprise, it would not have incurred.

192.    Plaintiff was the direct target of Defendant's scheme.

193.    But for the conduct of Defendant alleged herein, Plaintiff would not have been injured.  The injury suffered by Plaintiff was a foreseeable and natural consequence of the scheme to defraud.

194.    The injuries of Plaintiff were directly and proximately caused by Defendant's racketeering activity that deceived and defrauded consumers and resulted in a meteoric rise of youth-vaping.

195.    As a result and by reason of the foregoing, Plaintiff has been injured, suffered harm and sustained damage to its business and property, and is therefore entitled to recover actual and treble damages, and its costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

196.    In addition, as set forth above, Defendant has violated 18 U.S.C. §§ 1962 (c), and (d), and will continue to do so in the future.

197.    Enjoining Defendant from committing these RICO violations in the future and/or declaring their invalidity and disgorging ill-gotten gains is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to issue appropriate orders to provide equitable relief to civil RICO plaintiffs and enjoin violations of 18 U.S.C. § 1962.

198.    Plaintiff seeks compensatory damages, disgorgement, equitable relief, injunctive relief, treble damages, and attorneys' fees.

**Count II**
**Public Nuisance**

199.    Plaintiff incorporates by reference all preceding paragraphs.

200.    Defendant JUUL created and maintained a public nuisance which proximately caused injury to Plaintiff.

201.    Defendant's design, manufacture, production, marketing, distribution, and sale of highly-addictive and harmful e-cigarettes and nicotine juice pods, when such actions were taken with the intent to market and, in fact, were marketed to youth through repeated misstatements and omissions of material fact, unreasonably interfered with a public right in that the results of Defendant's actions created and maintained a condition dangerous to the public's health, was offensive to community moral standards, or unlawfully obstructed the public in free use of public property. Defendant intentionally created and maintained a public nuisance by, among other acts:

   a.    designing a product that was uniquely youth-oriented in design, resembling a common USB flash drive;

   b.    designing a product that was meant to facilitate underage use, both generally and by enabling easy concealment of Defendant's e-cigarette in school;

   c.    designing a product with a nicotine delivery system that results in a quicker and more potent dose of nicotine to its users;

   d.    designing a product with as little irritation to a user's throat, like that experienced from smoking a combustible cigarette, as possible to facilitate initiation of nicotine use by youth and non-smokers;

   e.    designing a flavored nicotine juice for its e-cigarette that was intended to mask the harmful effects of nicotine and facilitate initiation of nicotine use by youth and non-smokers;

f.   marketing highly-addictive nicotine products to youth, who are, because of their age and lack of experience, particularly susceptible to Defendant's targeted marketing preying on their need for social acceptance;

g.   marketing a nicotine product to a population—youth—that, because of their developmental stage, is more susceptible to nicotine addiction;

h.   marketing nicotine products to a population—youth—that faces an increased risk of adverse mental and physical health impacts from nicotine use; and

i.   misrepresenting, in marketing and elsewhere, the actual amount of nicotine that its product contains and delivers, as well as misrepresenting the amount of benzoic acid and other chemicals Defendant's nicotine juice contains.

202.   Defendant's acts described throughout this Complaint and in the preceding paragraph were continuous and occurred over a span of several years and, in fact, in large part are continuing to occur.

203.   The public nuisance created and maintained by Defendant's wrongful acts inundated Plaintiff's schools, in that the nuisance created was in close proximity to Plaintiff. The nuisance created and maintained by Defendant has resulted in an epidemic of nicotine use by students, as well as significant expenditures—past, present, and future—by Plaintiff to combat the epidemic. Indeed, as discussed herein, Defendant and agents thereof presented directly to students at schools and through youth programs and community events, in addition to the youth-oriented design and marketing of Defendant's nicotine products.

204.   The public nuisance created and maintained by Defendant has resulted, and continues to result, in significant damage and annoyance to Plaintiff. Again, the FDA and

others have recognized that teen vaping is an epidemic and that Defendant's actions are at the heart of that epidemic.

205.   The injury suffered by Plaintiff is distinguishable from that suffered by the general public, both in kind and quality.  Plaintiff, a school district, has incurred, and continues to incur, significant expenditures of time and resources to combat rampant use of Defendant's nicotine products by students, including during school. The significant time and resources necessary to combat this reality and maintain the safety of Plaintiff's students and achieve the educational goals of Plaintiff are unique from the harm suffered by the general public.

**Count III**
**Negligence**

206.   Plaintiff incorporates by reference all preceding paragraphs.

207.   Defendant owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm.

208.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

209.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products.

Defendant's duty of care owed to consumers and the general public, including Plaintiff, included providing accurate, true, and correct information concerning the risks of using JUUL products and appropriate, complete, and accurate warnings concerning the potential adverse effects of vaping and nicotine use and, in particular, JUUL's patented nicotine salts and the chemical makeup of JUULpods liquids.

210.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of JUUL products and specifically, the health hazards posed by vaping JUULpods and continued use of nicotine, particularly among adolescents.

211.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of JUUL e-cigarettes and JUULpods by students could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to Plaintiff.

212.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products including but not limited to the risks of continued nicotine use and nicotine addiction.

213.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its JUUL e-cigarettes and JUULpods, in that Defendant manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, knew

or had reason to know of the defects inherent in its products, knew or had reason to know that a consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

214.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has made false and/or misleading statements concerning the safety and/or use of JUUL products and nicotine vaping.

215.    Defendant's negligence included:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its JUUL products without thorough and adequate pre- and post-market testing;

b.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not JUUL products were safe for their intended use;

c.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of JUUL products so as to avoid the risk of serious harm associated with the prevalent use of JUUL products and nicotine;

d.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use its JUUL products;

e.      Failing to disclose to Plaintiff, users, consumers, and the general public that the use of JUUL products presented severe health risks including nicotine addiction;

f.      Representing that its JUUL products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

g.  Declining to make or propose any changes to JUUL products' packaging or other promotional materials that would alert the consumers and the general public of the true risks of JUUL products;

h.  Advertising, marketing, and recommending the use of JUUL products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of JUUL products;

i.  Continuing to disseminate information to consumers, which indicates or implies that Defendant's products are not unsafe for their intended use; and

j.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

216.   Defendant knew and/or should have known that it was foreseeable that Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

217.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods liquids by Plaintiff's students.

218.   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

219.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of aggravated or punitive damages.

220.   As a proximate result of Defendant's wrongful acts and omissions in placing its defective JUUL products into the stream of commerce without adequate warnings of their hazardous nature, Plaintiff has been injured and suffered economic damages and will continue to incur damages in the future.

## Count IV
## Gross Negligence

221.   Plaintiff incorporates by reference all preceding paragraphs.

222.   Defendant owed a duty of care to Plaintiff to conduct its business of manufacturing, promoting, marketing, and/or distributing JUUL nicotine products in compliance with applicable state law and in an appropriate manner.

223.   Specifically, Defendant had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that JUUL marketing does not target minors; ensuring that JUUL e-cigarettes and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that is not defective and unreasonably dangerous; designing a product that will not addict youth or other users to nicotine; and adequately warning of any reasonably foreseeable adverse events with respect to using the product. Defendant designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to those, including Plaintiff, who would be impacted by their use.

224.   JUUL's products were the types of products that could endanger others if negligently made, promoted, or distributed.  Defendant knew the risks that young people would be attracted to their e-cigarettes and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

225.   Defendant knew or should have known that its marketing, distribution, and sales practices did not adequately safeguard minors from the sale and/or distribution of e-cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

226.   Defendant was negligent in designing, manufacturing, supplying, distributing, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling JUUL's products.

227.   As powerfully addictive and dangerous nicotine-delivery devices, Defendant knew or should have known that JUUL's products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, without defects and with due care to avoid needlessly causing harm.  Defendant knew or should have known that its products could cause serious risk of harm, particularly to young persons like students in Plaintiff's schools.

228.   Defendant was negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

229.   The negligence and extreme carelessness of Defendant includes, but is not limited to, the following:

a.      Failure to perform adequate testing of the JUUL products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

b.      Failure to take reasonable care in the design of JUUL's products;

c.      Failure to use reasonable care in the production of JUUL's products;

d.      Failure to use reasonable care in the manufacture of JUUL's products;

e.      Failure to use reasonable care in the assembly of JUUL's products;

f.      Failure to use reasonable care in supplying JUUL's products;

g.      Failure to use reasonable care in distributing JUUL's products;

h.      Failure to use reasonable care in advertising, promoting, and marketing JUUL's products;

i.      Promotion of JUUL's products to young people under age 26, and especially to minors;

j.      Use of flavors and design to appeal to young people under age 26, and especially to minors, in that the products smell good, look cool and are easy to conceal from parents and teachers;

k.      Use of design that maximizes nicotine delivery while minimizing "throat hit," thereby easily creating and sustaining addiction;

l.      Failure to prevent JUUL's products from being sold to young people under age 26, particularly to minors;

m.      Failure to prevent use of JUUL's products among young people under age 26, particularly for minors;

n.      Failure to curb use of JUUL's products among young people under age 26, particularly for minors;

o.      Failure to develop tools or support to help people addicted to JUUL's products cease using the products, including manufacturing lesser amounts of nicotine;

p.      Failure to reasonably and properly test and properly analyze the testing of JUUL's products under reasonably foreseeable circumstances;

q.   Failure to warn its customers about the dangers associated with use of JUUL's products, in that it was unsafe for anyone under age 26, significantly increases blood pressure, carries risks of stroke, heart attacks, and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition;

r.   Failure to instruct customers not to use the product if they were under 26, particularly minors, and failing to provide any instructions regarding a safe amount of JUULpods to consume in a day;

s.   Failure to ensure that JUUL's products would not be used by persons like Plaintiff's students who were not smokers and who were under age 26, particularly minors;

t.   Failure to warn customers that JUUL had not adequately tested or researched JUUL products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

u.   Failure to utilize proper materials and components in the design of JUUL's products to ensure they would not deliver unsafe doses of nicotine;

v.   Failure to use due care under the circumstances;

w.   Failure to take necessary steps to modify JUUL's products to avoid delivering high doses of nicotine to young people and repeatedly exposing them to toxic chemicals;

x.   Failure to recall JUUL's products; and

y.   Failure to inspect JUUL's products for them to operate properly and avoid delivering unsafe levels of nicotine to young persons.

230.   Defendant breached the duties it owed to Plaintiff and in doing so, was wholly unreasonable. A responsible company, whose primary purpose is to help adult smokers, would not design a product to appeal to minors and nonsmokers nor market their products to minors and nonsmokers. If they are aware of the dangers of smoking and nicotine ingestion

enough to create a device to help people stop smoking, then they are aware of the dangers enough to know that it would be harmful for young people and nonsmokers to use.

231.    Defendant breached its duties through its false and misleading statements and omissions in the course of its manufacture, distribution, sale, and/or marketing of JUUL nicotine products within the State.

232.    As a foreseeable consequence of Defendant's breaches of its duties, Plaintiff suffered direct and consequential economic injuries as a result of dealing with the JUUL epidemic in Plaintiff's schools.

233.    Defendant's breaches of its duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute gross, willful, or anton conduct.

234.    Defendant's gross negligence was egregious, directed at the public generally, and involved a high degree of moral culpability.

## Count V
## Willful Misconduct

235.    Plaintiff incorporates by reference all preceding paragraphs.

236.    Defendant committed intentional acts of an unreasonable character in disregard of known or obvious risks so great as to make it highly probably that harm would result in the course of its manufacture, distribution, sale, promotion, advertising and/or marketing of JUUL products within the State.

237.    Defendant knew the risks that minors would be attracted to its e-cigarettes and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors and young people.

238.    Defendant could have easily marketed the products to a whole different audience of prior smokers as well as could have easily informed the ultimate consumers of the extremely high nicotine content, the true level of which Defendant misrepresented and concealed.

239.    Defendant breached the duties it owed to Plaintiff and in doing so, was wholly unreasonable. Defendant breached its heightened duties owed to minors when it intentionally marketed and sold JUUL products to minors, which it should not have done.

240.    Defendant's acts and omissions constitute wanton and willful conduct because they constitute a total lack of care and an extreme departure from what a reasonably careful person or a reasonably careful company that holds itself out as manufacturers of smoking cessation devices would do in the same situation to prevent foreseeable harm to young persons.

241.    Defendant acted and/or failed to act willfully and with conscious and reckless disregard for the rights and interests of Plaintiff. Defendant's acts and omissions had a great probability of causing significant harm and in fact resulted in such harm.

242.    But for Defendant's duties and breaches thereof, Plaintiff would not have been harmed as alleged in this Complaint.

243.    As a consequence of each such intentional act, Plaintiff suffered direct and consequential economic injuries.

244.   Defendant's willful misconduct was egregious, directed at the public generally, and involved a high degree of moral culpability.

## Count VI
## Strict Product Liability – Failure to Warn

245.   Plaintiff incorporates by reference all preceding paragraphs.

246.   Defendant designed, manufactured, marketed, distributed, and sold JUUL e-cigarettes and JUULpods, or has partnered to design, manufacture, market, distribute, and sell JUUL e-cigarettes and JUULpods.

247.   At all times relevant, Defendant was well-aware of the dangers of vaping and nicotine use, including use of JUUL's products, as described herein.

248.   At all times relevant, Plaintiff and students at Plaintiff's school were not aware of and would not have recognized the risks of using a JUUL e-cigarette with a JUULpod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks to users' mental and physical health from use of Defendant's products, including high-levels of nicotine exposure and nicotine addiction.

249.   In all forms of advertising, including but not limited to social media communications, Defendant failed to warn adequately or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harm caused by vaping JUULpods, including but not limited to nicotine exposure and addiction. Defendant failed to warn adequately in its advertising or anywhere on the product that the product was not safe for minors and, instead, posed serious immediate and long-term health risks, and should not be used or consumed by them. Rather,

Defendant intentionally marketed its products to minors in youth-friendly colors and flavors. Defendant also designed its products to be more palatable to youth and nonsmokers by making JUUL e-cigarettes easier to inhale while increasing the level of nicotine that is absorbed by users, making them even more addictive.

250.    The defects in JUUL's products, including the lack of warnings or instructions, existed at the time the JUUL e-cigarettes and JUULpods were sold and/or when the JUUL e-cigarettes and JUULpods left JUUL's possession or control.

251.    JUUL's e-cigarettes and JUULpods were anticipated to be used by youth, including students, without substantial change in their condition from the time of their manufacture or sale.

252.    Plaintiff was harmed directly and proximately by Defendant's failure to warn. Such harm includes significant and ongoing nicotine abuse and addiction by students at Plaintiff's schools, which has necessitated and continues to necessitate significant steps to combat and mitigate use of Defendant's products by students. Use of Defendant's products by students at Plaintiff's schools frustrates Plaintiff's ability to achieve its educational goals and ensure the safety of Plaintiff's students which, again, has required and continues to require significant expenditures of Plaintiff's resources to address these conditions.

**Count VII**
**Strict Product Liability – Design Defect**

253.    Plaintiff incorporates by reference all preceding paraphs.

254.    Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled,

advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL e-cigarettes and JUULpods, which were intended by Defendant to be used as a method of vaping nicotine and the other aerosolized constituents of JUUL's nicotine solution.

255.   Defendant knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including students at Plaintiff's schools.

256.   As described herein, Defendant designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product. Because JUUL products deliver significantly more nicotine into a user's bloodstream than combustible cigarettes and contain more nicotine than JUUL represents, thereby posing an unnecessary risk of addiction and other severe health consequences, they are inherently defective.  In addition, because JUUL products are made to create and sustain addiction, including through a quicker and more potent delivery system than Defendant represented and compared to any other nicotine vaping product, they are unreasonably dangerous and defective in design.  The risks inherent in the design of JUUL products outweigh significantly any benefits of such design, including any benefit as an alternative to smoking combustible cigarettes.

257.   At all relevant times, Defendant could have employed reasonably feasible alternative designs to prevent the harms discussed herein.

258.   At all relevant times, Plaintiff and Plaintiff's students were unaware of the design defects described herein.  Further, Defendant knew or had reason to know that youths and adolescents, including students who Defendant told its products were "totally safe,"

would not fully realize the dangerous and addictive nature of JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

259.    Plaintiff was harmed directly and proximately by Defendant's defectively designed JUUL e-cigarette and JUULpods.  Such harm includes significant and ongoing nicotine abuse and addiction by students at Plaintiff's schools, which has necessitated and continues to necessitate significant steps to combat and prevent use of Defendant's products by students.  Use of Defendant's products by students at Plaintiff's schools frustrates Plaintiff's ability to achieve its educational goals and ensure the safety of Plaintiff's students which, again, has required and continues to require significant expenditures of Plaintiff's resources to address these conditions.

### Count VIII
### Unjust Enrichment

260.    Plaintiff incorporates by reference all preceding paragraphs.

261.    As a result of Defendant's unlawful and deceptive acts described above, Defendant was enriched at the expense of Plaintiff.

262.    Defendant JUUL retained the benefits under such circumstances as make the retention inequitable.  Defendant's unlawful and deceptive acts were undertaken to gain market share and revenue through increased usage of JUUL's products by students.

263.    It is against equity and good conscience to permit Defendant to retain the benefits they received as a result of its wrongful and continuing acts, practices and omissions.

## VI.   PRAYER FOR RELIEF

WHEREFORE,  Plaintiff prays for a judgment:

  a.   Awarding Plaintiff compensatory damages, trebled as provided in the RICO Act, in an amount to be determined at trial;

  b.   Awarding Plaintiff punitive damages;

  c.   Ordering all appropriate equitable remedies, including but not limited to declaratory and injunctive relief;

  d.   Awarding Plaintiff attorneys' fees and costs;

  e.   Awarding prejudgment interest as permitted by law; and

  f.   Affording Plaintiff with such further and other relief as deemed just and proper by the Court.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: October 21, 2019                              Respectfully submitted,

                                                     */s/ José de Jesús Rivera*____
                                                     José de Jesús Rivera, SBN 004604
                                                     MILLER, PITT, FELDMAN &
                                                     McANALLY, P.C.
                                                     2800 North Central Avenue,
                                                     Suite 840
                                                     Phoenix, AZ 85004-1069
                                                     (602) 266-5557; Fax (602) 266-2223
                                                     jrivera@mpfmlaw.com

                                                     */s/ Thomas P. Cartmell*____
                                                     Thomas P. Cartmell, KS #17020
                                                     Jonathan P. Kieffer, KS #18707
                                                     Tyler W. Hudson, KS #20293
                                                     Wagstaff & Cartmell LLP
                                                     4740 Grand Avenue, Suite 300
                                                     Kansas City, MO 64112
                                                     Tel. (816) 701-1100
                                                     Fax (816) 531-2372

tcartmell@wcllp.com
jpkieffer@wcllp.com
thudson@wcllp.com
ebarton@wcllp.com

*/s/ Kirk J. Goza*
Kirk J. Goza, KS #22330
Brad Honnold, KS #22972
Goza & Honnold LLC
9500 Nall Ave., Suite 400
Overland Park, KS 66207
Tel. (913) 451-3433
kgoza@gohonlaw.com
bhonnold@gohonlaw.com

*/s/ Andy D. Birchfield, Jr.*
Andy D. Birchfield, Jr.
Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com